FILED
JAMES BONINI
CLERK

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

08 JAN 16  PM 1: 37

| | |
|---|---|
| **ANTHONY WILLIAMS**<br>**8008 Innsbrook Place**<br>**Cincinnati, Ohio 45244**<br><br>**BGR, INC.**<br>**6392 Gano Road**<br>**West Chester, Ohio 45069**<br><br>**MUNAFO, INC.**<br>**9141 Cincinnati-Columbus Road**<br>**Cincinnati, Ohio 45241**<br><br>**AIKIDO OF CINCINNATI**<br>**4727 Red Bank Road**<br>**Cincinnati, Ohio 45227**<br><br>      **Plaintiffs,**<br><br>**v.**<br><br>**DUKE ENERGY INTERNATIONAL, INC.**<br>**dba DUKE ENERGY CORP.**<br>**526 South Church Street**<br>**Charlotte, NC 28202**<br><u>**Serve**</u>: **CT Corporation**<br>      **225 Hillsborough Street**<br>      **Raleigh, North Carolina 27603,**<br><br>      **Defendant.** | **CASE NO. 08 C V 046**<br><br>**JUDGE WEBER, J.**<br><br><br>**CLASS ACTION**<br>**COMPLAINT AND**<br>**JURY DEMAND** |

1.      This is a proposed class action brought by southern Ohio electricity users on behalf of southern Ohio businesses, other entities, and individual consumers purchasing electricity from defendant Duke Energy International, Inc. dba Duke Energy Corp. ("Duke Energy" or "defendant"), the successor to Cincinnati Gas & Electric ("CG&E") and Cinergy Corp. ("Cinergy"). In violation of federal and Ohio law, CG&E and Cinergy (collectively

referred to along with Duke Energy as "the conspirators") conspired to and did engage in a pattern of deceptive, sham transactions that had the intended effect of granting illegal, inequitable, and unfair price advantages for electricity to certain large corporate customers in southern Ohio, at the expense of defendant's other customers.

2.        Under their scheme, the conspirators created a sham entity called Cinergy Retail Services, LLC ("CRS"),[1] through which they funneled kickbacks to a number of large corporate customers in Greater Cincinnati as pay-back for those customers withdrawing their opposition to a major rate increase that CG&E sought from the Public Utilities Commission of Ohio ("PUCO").    The proposed rate increase included several non-bypassable (i.e., mandatory) charges.  Having induced the PUCO to approve those charges as mandatory tariffs that they and their competitors were bound to impose on electricity customers, the conspirators knowingly and consciously employed their massive kickback scheme to relieve the selected corporate customers of the burden of those mandatory tariffs.

3.        The conspirators have employed such side deals both to blunt opposition to their rate increase and to damage competition in the regional electricity industry.  The conspirators also have attempted to mislead their electricity users and the general public about, and conceal the existence of, their fraudulent, anti-competitive, and inequitable side deals.  The conspirators' scheme has resulted in substantial detriment and harm to thousands of southern Ohio businesses, political subdivisions, public institutions, and individual consumers.

4.        Plaintiff Munafo, Inc. is an Ohio corporation with its principal place of business in Cincinnati, Ohio, filing suit on behalf of itself and all similarly situated businesses affected by the conspirators' schemes (i.e., proposed Subclass 1).

---

[1] Duke Energy Retail Sales LLC, a North Carolina limited liability company, is the successor to CRS.

2

5.      Plaintiff BGR, Inc. is an Ohio corporation with its principal place of business in West Chester, Ohio, filing suit on behalf of itself and all similarly situated businesses affected by the conspirators' schemes (i.e., proposed Subclass 1).

6.      Plaintiff Anthony Williams is a citizen and resident of the State of Ohio, filing suit on behalf of himself and all other similarly situated electricity users affected by the conspirators' schemes (i.e., proposed Subclass 2).

7.      Plaintiff Aikido of Cincinnati is a non-profit Ohio corporation located in Cincinnati, Ohio, filing suit on behalf of itself and all other similarly situated electricity users affected by the conspirators' schemes (i.e., proposed Subclass 2).

8.      Plaintiffs did not enter into any of the alleged side deals with the conspirators.

9.      Duke Energy is a North Carolina corporation with its principal place of business in North Carolina, the successor to CG&E and Cinergy, and, with the merger of Duke Energy and Cinergy, a direct participant in the actions of the conspirators alleged herein.

10.     The Court has original jurisdiction over all claims in this action pursuant to 28 U.S.C. § 1332 and the amount-in-controversy exceeds $75,000.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, and pursuant to 28 U.S.C. § 1337 because this action alleges violations of the Robinson-Patman Act.  Furthermore, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the alleged state law claims.

11.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to the claims alleged herein occurred in Greater Cincinnati, as well as under 15 U.S.C. §§ 15, 22, and 26.

12.     In 2003, CG&E applied to the PUCO for a rate increase for electricity customers.

3

13. CG&E faced considerable opposition to this proposed rate increase from companies affiliated with groups known as Industrial Energy Users-Ohio ("IEU") and Ohio Energy Group ("OEG"), which included many of the largest companies in the Greater Cincinnati area.

14. In 2004, Cinergy created CRS as a competitive retail electric service provider whose generation rates are not regulated by the PUCO. Personnel doing business for CRS were employed by Cinergy, and both CRS and Cinergy purported to operate at 139 East Fourth Street, Cincinnati, Ohio. CRS's only function was to process transactions on behalf of Cinergy. Therefore, CRS was and is a sham controlled by the conspirators.

15. In 2004, IEU and OEG suddenly and unequivocally changed their stance from opposing to supporting CG&E's rate increase. The PUCO approved the rate increase in 2004.

16. Also in 2004, CRS entered into "Option Agreements" with IEU/OEG-affiliated companies. On information and belief, these "Option Agreements," effective January 2005, provided that CRS would pay the particular IEU/OEG-affiliated company signing the agreement the equivalent of certain defined charges that the IEU/OEG-affiliated company was required to pay to CG&E. The amount kicked back to the IEU/OEG-affiliated companies under these side deals represented all or substantially all of the rate increase that CG&E had requested and that the PUCO had approved, which CG&E and its competitors were required to impose on customers.

17. Under the "Option Agreements," the participating IEU/OEG-affiliated companies promised to utilize CRS for current electric services until such time as they chose to use another service provider. In effect, CRS agreed to pay back to certain IEU/OEG-affiliated companies the entire, or almost the entire, rate increase that each IEU/OEG-affiliated company paid to CG&E, a

4

company owned by Cinergy. Because the contracts were created by CRS, an affiliate of Cinergy whose generation rates are unregulated, the "Option Agreements" were not made public.

18.     In on-the-record proceedings before the Supreme Court of Ohio in Case Number 05-0946, the conspirators consciously and deceptively denied having any knowledge of the existence of any such side deals. (See Exhibit A.) In a further attempt to hide their wrongdoing from public scrutiny, the conspirators have attempted to conceal the unlawful terms of their "Option Agreements" behind a web of redactions. (See Exhibit B.)

19.     In 2005 alone, although CRS did not supply any electric services, CRS paid out approximately $15,000,000 (fifteen million dollars) in "Option Payments" to IEU/OEG-affiliated companies.

20.     The "Option Agreements" remain in effect at the present time.

21.     By paying certain IEU/OEG-affiliated companies an amount equal to all or substantially all of the rate increase charged by CG&E, the conspirators essentially offered a reduced rate to certain electricity consumers without extending that offer to all electricity consumers.

22.     Plaintiffs propose to represent a class consisting of all of defendant's (or the conspirators') electric customers who did not enter into any "Option Agreement" with the conspirators.     Plaintiffs further propose that the class be divided into the following two subclasses:  Subclass 1 - All businesses that were and/or are defendant's or the conspirators' electric customers and did not enter into any "Option Agreement" with the conspirators. Subclass 2 - All of the defendant's or the conspirators' other electric customers who did not enter into any "Option Agreement" with the conspirators.

5

23. The proposed class consists of tens of thousands of electricity customers. Therefore, the class is so numerous and dispersed that joinder is impracticable.

24. With the help of qualified counsel who are experienced in such litigation, Plaintiffs are capable of adequately representing the proposed class for any and all purposes, in that Plaintiffs, like the other members of the proposed class, were forced to shoulder the burden of the price advantages given to the large corporate customers under the side deals.

25. There are numerous common questions of law and fact, including but not limited to the following: whether the conspirators conspired to and did engage in a pattern of deceptive, sham transactions that had the intended effect of granting illegal and unfair price advantages for electricity to certain large corporate customers, at the expense of defendant's other customers; whether the conspirators funneled payments to a group of corporate customers in Greater Cincinnati as pay-back for those customers withdrawing their opposition to a major rate increase that CG&E sought from the PUCO; whether the proposed rate increase consisted of several non-bypassable (i.e., mandatory) charges; whether the conspirators induced the PUCO to approve those charges as mandatory tariffs that they and their competitors were bound to impose on electricity customers, and then knowingly and consciously employed their massive kickback scheme to relieve the selected corporate customers of the burden of those mandatory tariffs; whether the conspirators have attempted to mislead their electricity users and the general public about, and conceal the existence of, their scheme; whether the conspirators' scheme has resulted in substantial detriment and harm to thousands of southern Ohio businesses, political subdivisions, public institutions, and individual consumers who were forced to pay more for electricity so that the conspirators' selected corporate customers could pay less; and whether punitive damages should be assessed against defendant.

6

26.     In all relevant respects, Plaintiffs' claims are typical of those of the other class members in that Plaintiffs, like the other members of the proposed class, were forced to shoulder the burden of the price advantages given to the large corporate customers under the side deals.

27.     Certification of Plaintiffs' claims for class action treatment is appropriate pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure, in that, under Rule 23(b)(1)(A), the prosecution of separate actions over these side deals by individual members of the class would create the risk of inconsistent adjudications with respect to the individual members of the class that would establish incompatible standards of conduct for defendant regarding the side deals; under Rule 23(b)(2), the conspirators, by entering into and carrying out these unlawful side deals, acted on grounds generally applicable to the class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole, halting defendant's scheme; and, under Rule 23(b)(2), classwide questions concerning defendant's conduct and the harm thereby inflicted on class members by far predominate over any questions affecting only individual class members and a class action is far superior to any other available method for fairly and efficiently compensating class members for the harm they suffered as a result of the conspirators' scheme.

## FIRST CLAIM FOR RELIEF

28.     Plaintiffs incorporate by reference and reallege each and every prior and succeeding allegation of this Complaint.

29.     CRS is a corporation that is an ongoing organization, separate and distinct from the pattern of unlawful activity in which it is engaged. The conspirators established CRS to accomplish one major goal: to create a separate entity that would provide lower pricing for

7

electricity to certain corporate customers, in order to avoid obvious federal and state violations that would come to light by virtue of regulatory oversight of the conspirators' pricing.

30.     The conspirators were and are directly involved in the conduct of CRS's affairs by participating in the operation and management of CRS.

31.     The pattern of illegal activity involved in this case consists of multiple and repeated acts of fraud, from 2004 to the present, with a threat of continuing illegal activity throughout and beyond 2008.

32.     The conspirators have engaged in a scheme and artifice to defraud, in order to obtain a rate increase and impose it on Plaintiffs. Since 2004, the conspirators sent documents containing misrepresentations and omissions to Plaintiffs, in particular falsely representing that certain charges had to be paid, and omitting the material fact that CRS was kicking back such charges to certain other users.

33.     The conspirators took these actions with specific intent to deceive and defraud, and did in fact defraud, Plaintiffs. The total number of such fraudulent misrepresentations and omissions are too voluminous to recount. Plaintiffs actually and reasonably relied, to their detriment, on these misrepresentations and omissions. Had they known of the kickbacks paid by CRS, they would have been in a position to demand the same treatment, or to prevent the advantage received by the favored purchasers, which advantage has the effect of ultimately driving up rates for all purchasers.

**34.**    Plaintiffs have been directly injured in their businesses and/or property as a result of these violations. All Plaintiffs have suffered substantial damages as a proximate result of this fraud.

35.     The electric power industry is composed generally of three functional levels: production, transmission, and distribution. Production encompasses the conversion into electric power of energy obtained from the combustion of fossil fuels, including moving water, or from atomic reaction. Transmission refers to the moving of electric energy via transmission facilities from points where the energy is generated to interconnection with other utilities and the distribution center. Distribution involves the delivery and sale of electricity to the ultimate consumer.

36.     At all relevant times, the conspirators comprised a large electric system operating throughout the United States and serving large areas of, inter alia, Ohio Kentucky, and Indiana, supplying residential, commercial and industrial customers directly. The conspirators controlled extensive transmission lines in defendant's service area.

37.     At all relevant times, the conspirators engaged in, and their activities affected, interstate commerce.

38.     At all relevant times, the conspirators have bought electric power from and sold it to electric utilities, generators and marketers located in several states, and have exchanged power among them across state lines. Upon information and belief, the sales of electric power in this case were and often are interstate in origin, particularly in times of high demand. The alleged violations of law described herein have affected, and are affecting, the flow of electric power in interstate commerce.

39.     At all relevant times, the conspirators have owned and controlled the only electric transmission facilities by which the Plaintiffs can purchase power for use in southern Ohio.

9

## SECOND CLAIM FOR RELIEF

40.    Plaintiffs incorporate by reference and reallege each and every prior and succeeding allegation of this Complaint.

41.    The conspirators have violated Section 2a of the Clayton Act, as amended by the Robinson-Patman Act (15 U.S.C. § 13(a)), by discriminating in the price of electricity, a commodity, in contemporaneous sales to purchasers in interstate commerce, where the electricity is sold for use in the United States. The violations occurred in the course of such commerce.

42.    At all relevant times, the conspirators have actively controlled CRS, whose sales were and are imputed to the conspirators for purposes of the price discrimination provisions of the Robinson-Patman Act.

43.    The effect of the discrimination – which has been sustained since January 2005, and will continue unabated at least during 2008, if not longer – is significant and may substantially lessen competition in the markets in which certain Plaintiffs who belong to Subclass 1 compete, including Munafo, Inc. and, on information and belief, BGR, Inc. Such Plaintiffs have suffered antitrust injury by, among other things, having lost profits to the favored purchasers. Such Plaintiffs have suffered damages from this antitrust violation, in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

44.    Plaintiffs incorporate by reference and reallege each and every prior and succeeding allegation of this Complaint.

45.    In the interest of furthering competition in the newly formed competitive retail electric service market, Ohio has adopted a policy deterring the formation of anti-competitive subsidies of non-competitive retail electric service providers, such as Cinergy. The conspirators

10

violated this policy when they created CRS because the two companies combined to form a monopolistic energy source resulting in a market deficiency and imbalanced market power.

**46.** Ohio law prohibits public utilities from granting reduced rates to consumers or from extending a privilege to some consumers without extending the same to all consumers. Under Ohio law, a public utility may not "directly or indirectly" remit or refund "any rate, rental, toll or charge so specified, or any part thereof, or extend to any person, firm, or corporation, any rule, regulation, privilege, or facility except such as are specified" in its PUCO schedule "and regularly and uniformly extended to all persons, firms, and corporations under like circumstances for like, or substantially similar, service." Ohio Revised Code Section 4905.32.

47. The conspirators conspired to violate and did violate Ohio law by granting a privilege or reduced rate to certain corporate customers, while failing to offer the same or a similar privilege to all other consumers, including Plaintiffs and the classes they seek to represent.

48. The conspirators flagrantly disregarded Ohio corporate policy and law by creating CRS, an unregulated alter ego of Cinergy.

49. The conspirators' activity, as described herein, consisted of related schemes carried out over a number of years, which continue to this day. The related schemes have had the purpose and effect of causing consumers to incur and pay, without their knowledge, higher rates than they would have paid had the conspiracy not been undertaken.

50. There were, therefore, thousands of overt acts in furtherance of the conspiracy relating to Plaintiffs and other victims, which occurred during the relevant time period. These overt acts included misrepresentations or omissions made in furtherance of the schemes, as well as other

overt acts that may not themselves have constituted misrepresentations but were undertaken as an integral part of the schemes, and in furtherance thereof.

51. As a direct result of the conspiracy alleged herein, Plaintiffs and other electricity consumers have been injured in an amount to be determined at trial.

52. The conspirators deliberately and repeatedly concealed evidence of their wrongdoing from Plaintiffs and the general public.

## FOURTH CLAIM FOR RELIEF

53. Plaintiffs incorporate by reference and reallege each and every prior and succeeding allegation of this Complaint.

54. As a result of the foregoing, Plaintiffs have unjustly sustained losses and the conspirators correspondingly have been unjustly enriched. The conspirators should not be permitted to profit unjustly at the expense of Plaintiffs, nor should the conspirators be allowed to retain the profits, benefits, and fees associated with and resulting from the alleged conduct.

55. Plaintiffs are entitled to full restitution of all charges or tariffs that they paid and that the IEU/OEG-affiliated companies did not pay, plus interest.

## PUNITIVE DAMAGES

56. Plaintiffs incorporate by reference and reallege each and every prior and succeeding allegation of this Complaint.

57. The conduct of the conspirators was knowing, intentional, done with malice, aggravated or egregious fraud, demonstrated a complete lack of care, and was in conscious disregard of the rights of Plaintiffs. Plaintiffs are therefore entitled to an award of punitive damages, in conjunction with the foregoing claims for relief.

## **PRAYER**

WHEREFORE, Plaintiffs pray:

(a)     For a judgment that Duke Energy has violated Section 2 of the Clayton Act ( 15
U.S.C. § 13(a));

(b)     For an order, under § 4 of the Clayton Act (15 U.S.C. § 15), awarding to the
Plaintiffs treble damages, as a result of Duke Energy's violation of Section 2 of
the Clayton Act ( 15 U.S.C. § 13(a));

(c)     For an order permanently enjoining Duke Energy, its officers, agents, employees,
successors, and all persons in active concern or participation with them, from
engaging in, carrying out, or renewing any contracts, agreements, policies,
practices or understandings, or claiming any rights thereunder having the purpose
or effect of continuing, reviving, or renewing the aforesaid violation of the
Clayton Act, in accordance with the provisions of Section 16 of the Clayton Act
(15 U.S.C. § 26), or the aforesaid violation of state law;

(d)     For compensatory and punitive damages in accordance with Ohio law;

(e)     For the cost of their suit and reasonable attorneys' fees; and

(f)     For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Randolph H. Freking (0009158)
Kelly Mulloy Myers (0065698)
George Reul (0069992)
Tod Thompson (0076446)
Trial Attorney for Plaintiff
FREKING & BETZ
525 Vine Street, Sixth Floor
Cincinnati, OH  45202

Stanley M. Chesley (0000852)
Paul M. DeMarco (0041153)
W.B. Markovits (0018514)
Christopher D. Stock (0075443)
WAITE SCHNEIDER BAYLESS
  & CHESLEY CO., LPA
1513 Fourth & Vine Tower
One West Fourth Street

Phone: (513) 721-1975
Fax: (513) 651-2570
*randy@frekingandbetz.com*
*kmyers@frekingandbetz.com*
*greul@frekingandbetz.com*
*tthompson@frekingandbetz.com*

Cincinnati, OH 45202
Phone: (513) 621-0267
Fax: (513) 621-0262
*stanchesley@wsbclaw.com*
*demarcoworld@yahoo.com*
*billmarkovits@wsbclaw.com*
*chrisstock@wsbclaw.com*

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all claims.