IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


ANTHONY WILLIAMS, *et al.,*

        PLAINTIFFS,


    v.                       CASE NO. C1-08-046
                               JUDGE EDMUND A. SARGUS, JR.
                               MAGISTRATE JUDGE MARK R. ABEL

DUKE ENERGY INTERNATIONAL,
INC., *et al.,*

        DEFENDANTS.


<u>**OPINION AND ORDER**</u>

       This matter is before the Court for consideration of the Motions to Dismiss filed

by the Defendant, Duke Energy Corporation dba Duke Energy International, Inc., Duke Energy,

Inc., and Duke Energy Corp. (hereinafter "Duke Energy" or "the Defendant")[1] and the General

Motors Corporation ("GM").   For the reasons that follow, the Motions to Dismiss are

**GRANTED**, as explained below.

**I.**

       The Plaintiffs, seeking certification as a class, bring a series of federal and state

claims.  All of the claims are based upon the Plaintiffs' allegations that Duke Energy, a state-

regulated public utility,  has through its subsidiaries paid unlawful rebates to certain large

---

      [1]The name of Duke Energy is not at issue in this motion proceeding.  The Defendant submits that
the proper party is Duke Energy, Inc.

customers, including GM.  The Plaintiffs charge that Duke Energy paid such rebates only to customers who had first filed objections before the Public Utilities Commission of Ohio ("PUCO") in a pending case regarding rate changes sought by the Duke Energy.  In exchange for withdrawal of the objections, the Plaintiffs contend those parties were paid substantial rebates, in violation of federal and state law.

The Plaintiffs seek relief under two federal statutes.  The first claim is brought under the Robinson-Patman Act, 15 U.S.C. § 13(a), an antitrust statute that prohibits price discrimination damaging smaller competitors.  In the second claim, the Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).  In the third claim, the Plaintiffs allege that the Defendants violated the Ohio Pattern of Corrupt Activities Act, O.R.C. § 2923.31, *et seq*.  Finally, the Plaintiffs allege in the Amended Complaint state-law claims of fraud, while seeking disgorgement of alleged rebates paid to GM and other large customers.

The Defendants contend pursuant to Fed. R. Civ. P. 12(b)(1) that the claims set forth are not within the subject-matter jurisdiction of this Court.  In addition, the Defendants seek dismissal of the Amended Complaint under Fed. R. Civ. P. 12(b)(6), asserting that the claims fail to state legally sufficient causes of action.

## II.

A certain amount of background information is necessary to address the issues raised by the parties.  In 1999, the Ohio General Assembly enacted legislation which "restructured Ohio's electric-utility industry to increase retail competition."  *Ohio Consumers' Counsel v. Pub. Util. Comm'n.*, 111 Ohio St. 3d 300, 301 (Ohio 2006).  The restructuring

2

legislation also provides for a transition period, termed "market development period," not to exceed five years, which was to end when specified numbers of residential and non-residential customers switched suppliers of electricity. *Id.* Essentially, after the market development period, the legislation removed the authority of the PUCO to set electric rates and instead created a structure designed for competition and market-based rates.[2]

Relevant to this case, on January 10, 2003, Duke Energy's predecessor, Cincinnati Gas & Electric Company ("CG & E"), filed an application with the PUCO seeking to establish marked-based pricing of electrical rates. *Id.* Thereafter, the PUCO directed CG & E to file a proposed rate-stabilization plan, which was then scheduled for public hearing. *Id.* at 302. During the evidentiary hearing that followed, an adjournment was ordered to facilitate ongoing settlement negotiations. Thereafter, CG & E filed a stipulation regarding the outstanding rate issues. The stipulation was agreed to by a number of parties, including GM. *Id.* The Ohio Consumers' Counsel ("OCC") opposed the stipulation. *Id.*

Shortly after the stipulation was filed, the OCC sought discovery from CG & E to determine whether the utility had entered into side agreements not filed with the PUCO, which caused GM and others to withdraw their objections to the rate-stabilization plans. *Id.* The PUCO denied the request for discovery of any side agreements.

The Supreme Court of Ohio reversed the PUCO and held:

> OCC argues that the existence of side agreements could be relevant to a determination that the stipulation was not the product of serious bargaining. OCC suggests that if CG & E and one or more of the signatory parties agreed to a side financial arrangement or

---

[2]In a manner not implicated in this case, legislative changes have subsequently occurred in the market-based regime enacted in 1999.

3

some other consideration to sign the stipulation, that information
would be relevant to the commission's determination of whether all
parties engaged in "serious bargaining." We agree.

\* \* \*

Both the commission and intervenor IEU-O contend that the
possible existence of separate, undisclosed agreements among
some of the parties is irrelevant to the commission's evaluation of
the reasonableness of the stipulation. They urge this court to
conclude that the commission's reasonableness review is limited to
the written stipulation. . . . Whether the stipulation was the product
of serious bargaining, however . . . cannot be resolved solely by
reviewing the proposed stipulation. The commission cannot rely
merely on the terms of the stipulation but, rather, must determine
whether there exists sufficient evidence that the stipulation was the
product of serious bargaining. Any such concessions or
inducements apart from the terms agreed to in the stipulation might
be relevant to deciding whether negotiations were fairly conducted.
The existence of concessions or inducements would seem
particularly relevant in the context of open settlement discussions
involving multiple parties, such as those that purportedly occurred
here. If there were special considerations, in the form of side
agreements among the signatory parties, one or more parties may
have gained an unfair advantage in the bargaining process.
Therefore, we hold that the commission erred in denying discovery
of this information based on lack of relevancy.

*Ohio Consumers' Counsel v. Pub. Util. Comm'n*, 111 Ohio St. 3d at 320-21.

On remand, the PUCO ordered discovery of any documents relevant to side

agreements between CG & E and its customers.  Thereafter, the PUCO conducted an evidentiary

hearing on the issue of whether the rate-stabilization plan was reasonable.  *In re Cincinnati Gas*

*& Elec. Co.*, 2007 WL 3197045 (Ohio P.U.C., Oct. 24, 2007).   The PUCO expressly rejected

any consideration of the earlier stipulations.  *Id.*  With additional modifications, the PUCO

approved a rate-stabilization plan designed to lead into market-based rates.  *Id.*

The OCC again appealed to the Ohio Supreme Court, contending that the PUCO

limited the consideration of the side agreements to whether serious bargaining occurred. *Ohio Consumers' Counsel v. Pub. Util. Comm'n.*, – Ohio St. 3d – , 2009 WL 415604, *6 (Ohio, Feb. 19, 2009). The OCC contended that the PUCO should have considered whether CG & E engaged in unlawful discounting or discrimination in the supply of electricity. *Id.*

The Ohio Supreme Court disagreed and recently held on February 19, 2009, that the PUCO was correct in limiting consideration of the side agreements to the only issue before it– whether to approve or modify the applicaton for a market-based standard service.[3] The Ohio Supreme Court held:

> Pursuant to our remand, the side agreements were relevant to the commission's evaluation of the serious bargaining aspect of the reasonableness review for stipulations before the commission. Because the side agreements included agreements that the signatory parties would support the stipulation, they raised serious doubts about the integrity and openness of the stipulation-negotiation process. Therefore, the commission rejected the stipulation. But in the absence of the stipulation, the commission was still required to consider Duke's rate-stabilization application and set the market-based standard service offer. The side agreements are not relevant to this task.
>
> OCC may still raise additional issues arising from the side agreements, including its allegations of discrimination, inadequate corporate separation, and unlawful discounting of charges. Specifically, the OCC can use the complaint process set forth in R.C. 4928.16 or 4928.18, should any of the issues negatively impact its clients. . . .

*Id.* at *4.

In summary, the side agreements forming the basis of the Amended Complaint in

---

[3]Because the original rate-stabilization plan had expired on its own terms, the PUCO moved to consider a market-based standard service agreement. The rate-stabilization plan was intended to cover the transition period from regulated rates to market-based rates. 2009 WL 415604 at *3, *5.

this case have been considered by the PUCO, but only in reference to the application filed by

CG & E for market-based standard service. The Ohio Supreme Court ultimately concluded that

claims of price discrimination and unlawful discounting of charges may be brought before the

PUCO under O.R.C. § 4928.16 and § 4928.18, but only in a separate proceeding.

### III.

Under the Federal Rules of Civil Procedure, motions to dismiss for lack of

subject-matter jurisdiction fall into two categories: facial attacks and factual attacks.

Fed.R.Civ.P. 12(b)(1); *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack

challenges the sufficiency of the pleading itself. Upon receiving such a motion, the Court must

take all of the material allegations in the complaint as true and construe them in the light most

favorable to the non-moving party. *Id.* (*citing Scheuer v. Rhodes,* 416 U.S. 232, 235-37 (1974)).

In contrast, a factual attack of a pleading under Rule 12(b)(1) challenges the

factual existence of subject-matter jurisdiction. *See Ohio Hosp. Ass'n v. Shalala*, 978 F. Supp.

735, 739 (N.D. Ohio.1997). When a Court is inquiring about whether it has subject-matter

jurisdiction, "no presumptive truthfulness applies to the factual allegations, and the court is free

to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *United*

*States v. Ritchie*, 15 F.3d 592, 598 (6th Cir.1994); *see also RMI Titanium Co. v. Westinghouse*

*Elec. Corp*., 78 F.3d 1125, 1135 (6th Cir. 1996). In reviewing such a motion, a district court is to

probe the facts and assess the validity of its own jurisdiction. In doing so, the Court has "wide

discretion to consider affidavits and documents outside the complaint, and may even conduct a

limited evidentiary hearing if necessary." *Shalala*, 978 F. Supp. at 739 (citations omitted). The

plaintiff bears the burden of demonstrating that the Court has and may appropriately exercise

6

jurisdiction over the subject matter. *RMI Titanium,* 78 F.3d at 1134.  The Court may examine

evidence of its power to hear a case, and must make any factual findings to determine whether it

has jurisdiction. *Kroll v. United States*, 58 F.3d 1087, 1090 (6th Cir.1995); *Rogers v. Stratton

Inds., Inc.*, 798 F.2d 913, 915 (6th Cir.1986).  A Rule 12(b)(1) motion is not converted into one

for summary judgment under Rule 56 when a court examines evidence for this purpose. *Rogers*,

798 F.2d at 915.

       Federal Rule of Civil Procedure 12(b)(6) permits a defendant, by motion, to raise

the defense of a plaintiff's "failure to state a claim upon which relief can be granted." When

considering a motion to dismiss pursuant to Rule 12(b)(6), the Court "must construe the

complaint in the light most favorable to plaintiffs [and] accept all well-pled factual allegations as

true." *League of United Latin Am. Citizens v. Bredesen,* 500 F.3d 523, 527 (6th Cir.2007). While

this standard is "decidedly liberal," it nonetheless "require[s] more than bare assertions of legal

conclusions." *Bredesen*, 500 F.3d at 527.

       Rule 12(b)(6) must be read in conjunction with Rule 8(a) of the Federal Rules of

Civil Procedure which provides that a pleading for relief shall contain "a short and plain

statement of the claim showing that the pleader is entitled to relief."  Although a complaint need

not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his

'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a

cause of action's elements will not do. Factual allegations must be enough to raise a right to

relief above the speculative level on the assumption that all of the complaint's allegations are

true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964-65 (2007); *Bredesen*,

500 F.3d at 527. "The factual allegations, assumed to be true, must do more than create

7

speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief." *Id.* To survive a motion to dismiss, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory. *Twombly,* 127 S.Ct. at 1969.

IV.

The Defendants move to dismiss the Amended Complaint on two grounds. In the first, Duke Energy and GM contend under Fed. R. Civ. P. 12(b)(1) that this Court lacks subject-matter jurisdiction to hear the claims. In the second, the Defendants submit under Fed. R. Civ. P. 12(b)(6) that the Amended Complaint fails to state claims upon which relief may be granted.[4]

Although seeking dismissal of the Amended Complaint on two separate theories, the Defendants' Motions, in large part, turn on the claim that the filed rate doctrine, described below, bars Plaintiffs from pursuing any of their claims. As to the federal claims, Defendants contend that this Court lacks subject-matter jurisdiction insofar as the Plaintiffs cannot establish injury in fact. This is so if the filed rate doctrine governs in this case. If it does, the Plaintiffs cannot maintain federal antitrust or RICO claims, given that the doctrine holds that no cognizable injury arises when a defendant conforms to the filed rate. Given this posture, the Motions to Dismiss for lack of subject-matter jurisdiction essentially raise the same issue as the Motions to Dismiss for failure to state a claim.

The Plaintiffs respond by noting that the Amended Complaint does not challenge

---

[4]The Defendants also contend that, in the event the Court determines that the Motions to Dismiss should be denied, the Court should abstain and permit the PUCO and the Ohio Supreme Court to interpret and enforce Ohio law, citing *Buford v. Sun Oil Company*, 319 U.S. 315 (1943). Given the resolution of the Motions to Dismiss, the Court declines to address this issue.

8

any rate filed with the PUCO.  According to the Plaintiffs, their Complaint alleges rebates and kickbacks not filed with the PUCO, rendering the filed rate doctrine inapplicable.

As an initial matter not addressed by the parties, the Amended Complaint seeks to invoke the subject-matter jurisdiction of this Court on two independent grounds.  The Plaintiffs allege that the case involves parties from different states, and is a controversy exceeding $75,000, thereby invoking this Court's diversity jurisdiction under 28 U.S.C. § 1332.  The Plaintiffs also seek to invoke this Court's federal question jurisdiction as to the antitrust and RICO claims, which are based upon federal law, as provided in 28 U.S.C. § 1331.  The Amended Complaint also alleges that the state claims are properly before this Court under supplemental jurisdiction provided by 28 U.S.C. § 1367.

The briefing by the Defendants fails to distinguish the two separate grounds of subject-matter jurisdiction asserted by the Plaintiffs;  the distinction is of significance.  For example, a state statute placing exclusive jurisdiction over in-state electric rates or regulations affects the scope of this Court's diversity jurisdiction, but cannot by itself divest this Court of the jurisdiction expressly granted by Congress to hear claims under the Clayton Act or RICO.  That is because, in diversity claims, this Court applies state law; for federal-question claims, this Court applies federal law.   The Court analyzes separately the claims that this Court lacks subject-matter jurisdiction.

A.      Federal Question Jurisdiction

This Court has jurisdiction to hear claims arising under federal statutes, as provided in 28 U.S.C. § 1331.  The Clayton Act, in 15 U.S.C. § 15, and RICO, in 18 U.S.C. § 1964(c), provide for private causes of action and both specifically grant jurisdiction to the district

courts to hear such claims. Neither the Clayton Act nor RICO provides any exemption or exclusion for rates or utility charges established by state, or for that matter, federal regulatory agencies.

The Clayton Act was enacted in 1914 and amended by the Robinson-Patman Act in 1936, and contains exceptionally broad language prohibiting "any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchases of commodities of like and equal grade and quality. . . ." 15 U.S.C. § 13(a). In turn, the Clayton Act amended the Sherman Act, which was enacted in 1890 and is of continued vitality, which even more broadly prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . ." 15 U.S.C. § 1.

Neither the Clayton Act nor the Sherman Act exempts from its broad reach rates set by federal agencies, such as the former Interstate Commerce Commission ("ICC")[5] or state public utility commissions. In turn, statutes establishing the power of the ICC to set rates contained no exemption from the reach of the antitrust statutes.

In 1922, the Supreme Court confronted this conflict in *Koegh v. Chicago & N. W. Ry. Co.*, 260 U.S. 156 (1922). In *Koegh*, the plaintiff sued several railroads, claiming that the rates charged were so unreasonable and arbitrary as to eliminate competition. Justice Brandeis concluded:

> Section 7 of the Anti-Trust Act gives a right of action to one who has been "injured in his business or property." Injury implies violation of a legal right. The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff.

---

[5]The functions of ICC, greatly reduced over the years, are now placed in the Federal Energy Regulatory Commission ("FERC").

> Unless and until suspended or set aside, this rate is made, for all
> purposes, the legal rate, as between carrier and shipper. The rights
> as defined by the tariff cannot be varied or enlarged by either
> contract or tort of the carrier.

*Id.* at 163. According to the Supreme Court, because the rates approved by the ICC were found

to be fair and reasonable, a plaintiff could suffer no cognizable legal injury under the antitrust

laws by being charged the filed rate.

Courts have found various reasons to give broad application to the filed rate

doctrine. *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 992 (9th Cir. 2000)

(discussing history and evolution of the doctrine). In early cases involving the issue, the

challenged rates had been set by a regulatory agency, and were subject to appeal. In the case of

the ICC, Congress expressly provided that only the agency could set rates. Congress also

provided to the ICC authority to sanction rebates, which deviated from the filed rate. Congress

provided no other remedies, implying that the relief available before the ICC was exclusive.

The filed rate doctrine expanded in several regards relevant to this case. The

doctrine has been held to apply in cases involving state as well as federal regulatory agencies.

*Wegoland Ltd v. NYNEX Corp.*, 27 F.3d 17 (2d Cir. 1994); *Blaylock v. First American Title Ins.*

*Co.*, 504 F. Supp. 2d 1091 (W.D. Wash. 2007). The filed rate doctrine has been found to apply

in RICO cases. In *Wah Chang v. Duke Energy Trading and Marketing, LLC*, 507 F.3d 1222,

1225-26 (9th Cir. 2007), the court held:

> The filed rate doctrine's fortification against direct attack is
> impenetrable. It turns away both federal and state antitrust actions;
> it turns away Racketeer Influenced and Corrupt Organization Act
> actions; it turns away state tort actions; and it even turns away state
> attempts to assert sovereign power to commandeer power
> contracts. In short, it turns away attempts like Wah Chang's, which

> necessarily hinge on a claim that the FERC approved rate was too
> high and would, therefore, undermine FERC's tariff authority
> through the medium of direct court actions against the Energy
> Companies. (footnotes omitted)

From this, it is clear that the filed rate doctrine bars essentially all claims which seek judicial

relief dependent upon an attack on rates found by a regulatory agency to be fair and reasonable.

Two issues remain. The first is whether the Amended Complaint challenges filed

rates. The Plaintiffs contend that their claims involve only rebates and kickbacks which were

neither filed with nor approved by the PUCO. The Court disagrees. Whether payments are

rebates or kickbacks depends upon an analysis of the filed rate. A party claiming rate

discrimination is contending that the effective rate charged one party is too low, while the

charges to the plaintiffs are too high. More fundamentally, as described below, these issues are

relegated to the PUCO.

The second is a more difficult question. The filed rate doctrine evolved at a time

rates were regulated by a public body. In this case, for the period at issue, Duke Energy was

transitioning from regulated to market-based rates. In large part, this case involves market-based

electric rates. Many, if not all, of the reasons for the filed rate doctrine are lacking in market-

based, as opposed to regulated, rates. To be clear, a state is free to determine how to regulate or

deregulate the price of electricity. The question here is whether courts should find an implied

exception to the application of the antitrust and RICO statutes on the filed rate theory, when the

rate is not established by a regulatory agency.

This Court does not write on a clean slate. In *Square D Co. v. Niagra Frontier*

*Tariff Bureau, Inc.*, 476 U.S. 409, 417 (1986), the Supreme Court considered whether a filed

12

rate, not subject to regulatory approval, acted as a bar to an antitrust action. The Supreme Court held that the filed rate doctrine did apply to an unregulated, filed rate, but only because of the force of prior precedent. *Id.* at 421. The Court left no doubt that it would have preferred not to extend *Koegh* to unregulated rates but found itself bound by the doctrine of *stare decisis*.

More recently, a number of courts of appeals have addressed whether the filed rate doctrine applies to market-based rates. Of the four courts of appeals that have spoken on the issue, all have held that the doctrine does apply in a market-based regime. *Town of Norwood, Mass. v. New England Power Co.,* 202 F.3d 408, 419 (1st Cir. 2000); *Utilimax.com, Inc. v. PPL Energy Plus, LLC*, 378 F.3d 303, 306 (3rd Cir. 2004); *Public Utility District No. 1 of Snohomish County v. Dynegy Power Marketing, Inc.,* 384 F.3d 756, 760-61 ((9th Cir. 2004); *Texas Commercial Energy v. TXU Energy, Inc.,* 413 F.3d 503, 509 (5th Cir. 2005).

The Court of Appeals for the First Circuit emphasized that, while the rates were unregulated, a public-regulatory body continued to have oversight over rates. In *Town of Norwood*, the court concluded that, if the FERC had no supervisory powers to insure "just and reasonable rates," the filed rate doctrine would not apply. 202 F.3d at 419. Similarly, the Court of Appeals for the Fifth Circuit held in *Texas Commercial Energy,* that if rates are market-based and no regulatory agency has ultimate, supervisory authority, the filed rate doctrine is inapplicable. 413 F.3d at 509-10.

As to the PUCO, the Ohio Supreme Court recently emphasized that the "claims" of the OCC that Duke engaged in unlawful discounting, claims which included the allegations in this case, could be reviewed by the PUCO. *Ohio Consumers' Counsel v. Pub. Util. Comm'n.,* – Ohio St. 3d, 2009 WL 415604 at *4. Specifically, the Court found that the PUCO appropriately

13

directed the OCC to file a complaint pursuant to O.R.C. § 4928.18 to raise the issues of price

discrimination, inadequate corporate separation and unlawful discounting of charges that it

alleges results from the side agreements.   Moreover, the PUCO has jurisdiction under O.R.C. §

4928.16 to hear such complaints.  The PUCO has the power to order rescission of contracts or

restitution to customers.  O.R.C. § 4928.16(B)(1).  It is true, as Plaintiffs contend, that O.R.C. §

4905.32,  a specific statute prohibiting the collection of other than the filed rate, no longer

applies to market-based electric utilities.  The Court notes, as did the Ohio Supreme Court, that

the power vested in the PUCO to prevent discriminatory rates gives it authority to address

"allegations of discrimination, inadequate corporate separation, and unlawful discounting of

charges."  *Ohio Consumers' Counsel*, 2009 WL 419604 at \*4.

       Although the Court of Appeals for the Sixth Circuit has not spoken on the issue,

this Court is constrained to conclude that the filed rate doctrine does apply to market-based rates,

particularly in light of the United States Supreme Court decision in *Square D, supra.*  In a

market-based regime, however, application of the filed rate doctrine does not advance the

purposes for which the theory was developed.  An agency has not approved the rates; a consumer

may not challenge the rate itself, other than to claim unjust discrimination; the actual rate charged

may vary from customer to customer.[6]  Moreover, the filed rate doctrine is a judicially crafted

---

[6]In an early decision, the Supreme Court emphasized the role of filed rates:

Prior to the enactment of the act of February 4, 1887, (24 St. p. 379,) to regulate
commerce, commonly known as the 'Interstate Commerce Act,' railway traffic in this
country was regulated by the principles of the common law applicable to common
carriers, which demanded little more than that they should carry for all persons who
applied, in the order in which the goods were delivered at the particular station, and that
their charges for transportation should be reasonable. It was even doubted whether they
were bound to make the same charge to all persons for the same service . . .

14

exception to federal antitrust laws, which otherwise would on their face apply to claims brought in this case.  Despite these concerns, the Court is bound by precedent and finds that the filed rate doctrine precludes consideration of the Plaintiffs' federal claims.  This conclusion is based upon the assumption that the PUCO has the authority to determine whether the rates are discriminatory or involve unlawful discounting of charges.  If the PUCO lacks jurisdiction to address this question, or if the jurisdiction of the PUCO does not extend to fully resolve the Plaintiffs' claims, then this Court holds that the filed rate doctrine would be inapplicable.

**B.**     <u>**Diversity Jurisdiction**</u>

The Plaintiffs contend that this Court has independent diversity jurisdiction under 28 U.S.C. § 1332.  The parties are from different states and the amount in controversy exceeds $75,000.  In exercising diversity jurisdiction, this Court essentially sits a state court enforcing

---

* * *

. . . the evils which grew up under a policy of unrestricted competition, suggested the necessity of legislation by congress under its constitutional power to regulate commerce among the several states. These evils ordinarily took the shape of inequality of charges made, or of facilities furnished, and were usually dictated by or tolerated for the promotion of the interests of the officers of the corporation or of the corporation itself, or for the benefit of some favored persons at the expense of others, or of some particular locality or community, or of some local trade or commercial connection, or for the destruction or crippling of some rival or hostile line.

The principal objects of the interstate commerce act were to secure just and reasonable charges for transportation; to prohibit unjust discriminations in the rendition of like services under similar circumstances and conditions; to prevent undue or unreasonable preferences to persons, corporations, or localities; to inhibit greater compensation for a shorter than for a longer distance over the same line; and to abolish combinations for the pooling of freights.

*ICC v. Baltimore & Ohio R. Co.,* 145 U.S. 253 (1892).

This description does not encompass privately negotiated rates in a market-based pricing regime.

state law.  As explained by the Supreme Court in *Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938)

and again in *Bernhardt v. Polygraphic Co. of America.*, 350 U.S. 198, 203 (1956), a district court

exercising diversity jurisdiction applies the state law in the same manner as if the action had been

brought in state court.

        In O.R.C. § 4905.05, the law of the State of Ohio vests exclusive jurisdiction in

the PUCO regarding matters relating to the operation of public utilities.  Appeals from decisions

of the PUCO are made directly to the Ohio Supreme Court.  O.R.C. § 4903.12.   By the terms of

this statute, the state courts in Ohio are excluded from exercising jurisdiction to " . . . review,

suspend, or delay any order made by the public utilities commission, or enjoin, restrain, or

interfere with the commission. . . .   A writ of mandamus shall not be issued against the

commission or any commissioner by any court other than the supreme court."  O.R.C. § 4903.13.

        The Ohio Supreme Court has held that, "[t]he commission has exclusive

jurisdiction over various matters involving public utilities, such as rates and charges,

classifications, and service, effectively denying to all Ohio courts (except this court) any

jurisdiction over such matters."  *State ex rel. Cleveland Elec. Illum. Co. v. Cuyahoga Cty. Court

of Common Pleas,* 88 Ohio St. 3d 447 (Ohio 2000).  The Supreme Court of Ohio has also held

"'the jurisdiction specifically conferred by statute upon the Public Utilities Commission over

public utilities of the state . . . is so complete, comprehensive and adequate as to warrant the

conclusion that it is likewise exclusive.'"  *State ex rel. Northern Ohio Tel. Co. v. Winter*, 23 Ohio

St. 2d 6, 9 (Ohio 1970) (quoting *State ex rel. Ohio Bell Telephone Co. v. Court of Common

Pleas,* 128 Ohio St. 2d 553, 557 (Ohio 1934)).

16

As described, *supra*, the Court concludes that the relief sought by the Plaintiffs is integrally related to the rates charged by Duke Energy.  For the same reasons, this Court finds that rebates alleged by the Plaintiffs, for Ohio law purposes, are within the subject-matter jurisdiction of the PUCO.

The Plaintiffs raise an additional issue which they contend is outside of the PUCO's jurisdiction.  Ohio law contains the following anti-rebate provisions:

> No public utility shall charge, demand, exact, receive, or collect a different rate, rental, toll, or charge for any service rendered, or to be rendered, than that applicable to such service as specified in its schedule filed with the public utilities commission which is in effect at the time.

> No public utility shall refund or remit directly or indirectly, any rate, rental, toll, or charge so specified, or any part thereof, or extend to any person, firm, or corporation, any rule, regulation, privilege, or facility except such as are specified in such schedule and regularly and uniformly extended to all persons, firms, and corporations under like circumstances for like, or substantially similar, service.

O.R.C. § 4905.32.

The deregulation amendments enacted in 1999 includes a provision that, once market-based rates are implemented, the PUCO's authority becomes more limited.  O.R.C. § 4928.05(A)(1) provides:

> On and after the starting date of competitive retail electric service, a competitive retail electric service supplied by an electric utility or electric services company shall not be subject to supervision and regulation by a municipal corporation under Chapter 743. of the Revised Code or by the public utilities commission under Chapters 4901. to 4909., 4933., 4935., and 4963. of the Revised Code, except sections 4905.10 and 4905.31, division (B) of section 4905.33, and sections 4905.35 and 4933.81 to 4933.90; except sections 4905.06, 4935.03, 4963.40, and 4963.41 of the Revised

Code only to the extent related to service reliability and public
safety; and except as otherwise provided in this chapter.

There is no gainsaying that O.R.C. § 4905.32, which expressly prohibits rebates, is no longer

enforceable by the PUCO as to utilities operating with market-based rates.  According to

Plaintiffs, since the anti-rebate statute is not otherwise repealed, courts are the proper forum to

enforce O.R.C. § 4905.32.  This Court disagrees for several reasons.

First, the limitation on the applicability of O.R.C.  § 4905.32 is part and parcel of

a broad deregulation statute.   The fact that the PUCO lost jurisdiction to enforce O.R.C. §

4905.32 demonstrates that the General Assembly did not intend that the same statute now creates

a private cause of action in state or federal court.  In these circumstances, there is no explicit or

implicit private cause of action for the enforcement of the anti-rebate statute.

Second, Ohio courts have held that a legislative requirement, not imposed by the

United States or Ohio Constitutions, is not enforceable in the absence of an expressed remedy.

For example, in *State v. Myers*, 26 Ohio St. 2d 190 (Ohio 1971), the defendant claimed that a

state law required a police officer to advise him of his right to have his own blood alcohol test

taken by a physician or technician of his choosing.  The defendant contended that because no

such advice was given, the test results obtained by the officer must be suppressed.  The statute

did not contain any remedy for a violation of its terms.  Justice Duncan, later a judge of this

Court, disagreed and found "this was, and is, a matter for the General Assembly.  In our view

there is no judicial machinery available to produce the missing sanction."  *Id.* at 197.  Similarly,

O.R.C. § 4905.32 does not address a constitutional requirement and contains no judicial remedy.

It is therefore left to the legislature to draft a remedy, which it has not.

18

Finally, as the Court noted above, the Ohio Supreme Court has held that the virtually identical issues raised unsuccessfully in *Ohio Consumers' Counsel v. Pub. Util. Comm'n.*, 2009 WL 415604 at *4, are within the jurisdiction of the PUCO. The Court noted that a party raising "issues arising from the side agreements, including the allegation of discrimination, inadequate separation, and unlawful discounting of charges . . . can use the complaint process set forth in O.R.C. §§ 4928.16 or 4928.18 . . ." *Id.*

Based on this analysis, this Court, sitting in diversity, lacks subject-matter jurisdiction over the claims of the Plaintiffs.

## V.

Based upon the foregoing, the Court finds under Rule 12(b)(1), that the filed rate precludes all claims of damages allegedly incurred by the Plaintiffs, thereby depriving them of standing and this Court of subject-matter jurisdiction.[7] Defendants' Motions to Dismiss are **GRANTED**. The Clerk is **DIRECTED** to enter **JUDGMENT** in favor of Defendants.

IT IS SO ORDERED

3-31-2009
**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

---

[7]Again, Defendants move under Rule 12(b)(1) as to the federal claims, asserting that Plaintiffs lack antitrust standing because the filed rate doctrine precludes a finding of injury. Because the Court concludes the filed rate doctrine applies, to the extent provided above, the Motions to Dismiss under Rule 12(b)(1) are granted. As to Defendants motions pursuant to Rule 12(b)(6) for failure to state a claim, the Court would find under the filed rate doctrine, Plaintiffs' claims are barred.

19