# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

ANTHONY WILLIAMS, et al.,
      **Plaintiffs,**

    **v.**

DUKE ENERGY CORPORATION, et al.,
      **Defendants.**

**Case No. 1:08-cv-46**
**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Mark R. Abel**

## OPINION AND ORDER

This matter is before the Court on Plaintiffs' Renewed Motion for Class Certification. (ECF No. 159.)  For the reasons set forth below, the Court **GRANTS** Plaintiffs' motion.

### I.

This proposed class action was filed by Plaintiffs Anthony Williams, BGR, Inc., Munafo, Inc., and Aikido of Cincinnati, against Defendants Duke Energy International, Inc. and Duke Energy Corporation, retail electricity service providers.  Defendant Duke Energy International, which was dissolved in May 2005, was a subsidiary of Duke Energy Carolinas, LLC[1] ("Duke"). Plaintiffs' case centers on a subsidiary of Duke, Duke Energy Ohio, Inc., and an affiliated company, Duke Energy Retail Sales[2] ("DERS"), whom Plaintiffs accuse of wrongdoing. Plaintiffs allege that Duke, through Duke Energy Ohio and DERS, paid unlawful and substantial rebates to 24[3] large customers in exchange for the withdrawal by said customers of objections to

---

[1]Known at the time the Plaintiffs filed the complaint as "Duke Energy Corporation."

[2]Successor in interest to Cinergy Retail Services, LLC.

[3]Plaintiffs initially alleged that there were 22 large customers, but have since determined that there are 24.

a rate-stabilization plan that Duke was attempting to have approved by the Public Utilities
Commission of Ohio ("PUCO").

Specifically, on January 10, 2003, Duke Energy International's predecessor-in-interest,
Cincinnati Gas & Electric Company ("CG&E"), filed an application with the PUCO to establish
market-based pricing of electrical rates. *Ohio Consumers' Counsel v. Pub. Util. Comm'n*, 856
N.E.2d 213, 219 (Ohio 2006). Thereafter, the PUCO directed CG&E to file a proposed
rate-stabilization plan. *Id.* at 302. A number of parties filed objections to the proposed rate
increases in the rate-stabilization plan, which would govern the rates CG&E would be permitted
to charge through December 28, 2008. *In re Cincinnati Gas & Elec. Co.*, No. 03-93-EL-ATA,
2007 WL 3197045, at *2 (Ohio Pub. Util. Comm'n, Oct. 24, 2007). These parties included
companies affiliated with groups such as Industrial Energy Users-Ohio ("IEU"), Ohio Hospital
Association ("OHA"), and Ohio Energy Group ("OEG"), which included many of the largest
companies and hospitals in the Greater Cincinnati area. (Second Am. Compl. ¶ 16; ECF No.
166.)

In 2004, Duke entered into "Option Agreements" with IEU/OHA/OEG-affiliated
companies, including: 12 hospitals, two healthcare facilities, two oil companies, two automobile
manufacturers, an airplane manufacturer, a steel company, a manufacturer of cleaning supplies
and other household products, a manufacturer of industrial gases, a supplier of specialty nutrition
products and chemicals, and a supermarket chain. (Def. Mem. in Opp., Ex. 1; ECF No. 160-1.)
Plaintiffs refer to these companies as the "favored customers," because the Option Agreements
provided rebates to these companies totaling millions of dollars, which represents a portion of the
rate increase that CG&E had requested and that the PUCO had approved. *See id.* Plaintiffs

contend that these rebates were given in return for the withdrawal of the favored customers'
objections to Duke's rate-stabilization plan. CG&E filed a stipulation with the PUCO, which
was agreed to by the favored customers, who withdrew their objections to the rate-stabilization
plan. *Id.* The Ohio Consumers' Counsel, which represents Ohio consumers in actions before the
PUCO, opposed the stipulation.

   In this action, Plaintiffs allege that the rebates Duke paid to the favored customers violate
the Robinson-Patman Act of 1936, 15 U.S.C. § 13, *et seq.* ("RPA"), Ohio's Pattern of Corrupt
Activity Act, Ohio Rev. Code § 2923.31, *et seq.* ("OPCA"), the Racketeer Influenced and
Corrupt Organizations Act, 18 U.S.C. § 1962(c) ("RICO"), and common-law claims of fraud and
civil conspiracy. Upon Duke's motion, this Court dismissed this action for lack of subject matter
jurisdiction. Plaintiffs appealed that decision to the Sixth Circuit, which reversed the decision on
subject matter jurisdiction, and further found that Plaintiffs sufficiently pleaded each of their
claims under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and *Ashcroft v. Iqbal*,
556 U.S. 662 (2009). *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 802 (6th Cir. 2012).
The case was then remanded to this Court.

   After the Court held a scheduling conference with the parties, Plaintiffs filed a Renewed
Motion for Class Certification, which is fully briefed. (ECF No. 159, 160, 163.) Once briefing
was complete but before this Court issued its decision on Plaintiffs' Renewed Motion for Class
Certification, Duke filed a Motion for Leave to File *Instanter* a Supplemental Memorandum in
Opposition to Plaintiffs' Renewed Motion for Class Certification. (ECF No. 171.) Plaintiffs
filed a response to Duke's Motion in which they did not oppose the filing of the supplement, and
instead responded to Duke's new arguments related to whether this Court should certify this case

as a class action.  (ECF No. 173.)  Duke filed its reply brief on December 30, 2013.  (ECF No.

174.)  This Court granted Duke's Motion for Leave to File and indicated that it would consider

all of the supplemental briefing in its decision on Plaintiffs' Renewed Motion for Class

Certification.  (ECF No. 182.)

## II.

### A. Standard

A district court has broad discretion in determining whether an action is maintainable as a

class action.  *Violette v. P.A. Days, Inc.*, 214 F.R.D. 207, 211-12 (S.D. Ohio 2003) (citing

*Kentucky Educators Public Affairs Council v. Kentucky Registry of Election Finance*, 677 F.2d

1125, 1135 (6th Cir. 1982)).  That discretion must be exercised within the framework of Rule 23

of the Federal Rules of Civil Procedure.  *Id.* (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100

(1981)).  Within that framework, district courts must conduct a "rigorous analysis" into whether

the prerequisites of Rule 23 are met.  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

The Supreme Court recently explained:

> Frequently that "rigorous analysis" will entail some overlap with the merits of the
> plaintiff's underlying claim.  That cannot be helped.  "'[T]he class determination
> generally involves considerations that are enmeshed in the factual and legal issues
> comprising the plaintiff's cause of action.'"  *Falcon*, [457 U.S.] at 160 (quoting
> *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978); some internal quotation
> marks omitted).

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551–552 (2011) (parallel citations and

footnote omitted).

The burden is on the plaintiff to establish a right to class certification.  *Falcon*, 457 U.S.

at 160; *Alkire v. Irving*, 330 F.3d 802 (6th Cir. 2003).  Following the proposal of a properly

defined class, a plaintiff must satisfy the prerequisites set forth in Rule 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

If the plaintiffs satisfy all of the Rule 23(a) prerequisites, they may maintain a class action if they also meet the requirements of one of the three types of class action suits recognized in Rule 23(b). Fed. R. Civ. P. 23(b); *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998). Under Rule 23(b), one of three conditions must be met to maintain a suit as a class action:

> (1) there must be a risk of either incompatible standards of conduct or a risk that interests of prospective class members would be impaired by an adjudication of others' claims; (2) the party opposing the class has acted towards members of the class in a non-uniform way or (3) issues common to the class predominate over issues that are not common to the class and the best method of trying the suit is as a class action.

*Eddleman v. Jefferson Cnty., Ky.*, 96 F.3d 1448, 1996 WL 495013, at *3 (6th Cir. Aug. 29, 1996). *See also* Fed. R. Civ. P. 23(b).

## B. Class Definition

"A threshold issue that is implicit in a Rule 23 inquiry is that a court conclude that the named plaintiffs seeking certification propose an identifiable, unambiguous class in which they are members." *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, 402 (S.D. Ohio 2007) (citing *Foster v. D.B.S. Collection Agency*, No. 01-CV-514, 2002 WL 484500, at *3 (S.D. Ohio Mar. 26, 2002); *Reid v. White Motor Corp.*, 886 F.2d 1462, 1471 (6th Cir. 1989)). Here, the four

5

named plaintiffs – Anthony Williams, BGR, Inc., Munafo, Inc., and Aikido of Cincinnati – propose that the class they seek to represent be defined as follows:

> All ratepayers who received retail electric generation service from Duke Energy Corp. and/or Cinergy Corp. or their subsidiaries or affiliates at any time between January 1, 2005 and December 31, 2008 in the CG&E/Duke electric service territory and who did not receive rebates under the side agreements.

Plaintiffs contend, and this Court agrees, that the proposed class is defined with sufficient precision to allow the parties, the Court, and any Duke customers to determine class membership with certainty.

Plaintiffs further propose that business and residential ratepayers be divided into subclasses, given that Plaintiffs intend to pursue injunctive and declaratory relief under the RPA on behalf of a subset of business ratepayers who have competed with those receiving illegal rebates via the side agreements, *i.e.*, the Business Comp0etitor Subclass. In a footnote, Duke argues that the subclass definition is unacceptably vague and imprecise because it "requires this Court to answer the merits question of which businesses compete with rebate recipients before it can determine the businesses that are in the class." (Def. Mem. in Opp. at 11 n.4.) As the Court explains *infra*, in section III.A.4, it need not answer these merits questions in order to certify The Business Competitor Subclass. Thus, the Court finds that the subclasses too are defined with sufficient precision to allow the parties, the Court, and any Duke customers to determine class membership with certainty.

### III.

Plaintiffs contend that they have met their burden under Rule 23(a) and move for class certification under Rules 23(b)(1)(A), 23(b)(2), and 23(b)(3). Duke does not specifically take

6

issue with Plaintiffs' analysis under Rule 23(b), nor with their arguments related Rule 23(a)'s numerosity and typicality requirements. Instead, Duke argues that Plaintiffs have failed to establish commonality under Rule 23(a)(2) and have failed to show that the named plaintiffs meet the standard for fair and adequate representation under Rule 23(a)(4).

## A. Commonality

"Rule 23(a)(2) requires that for certification there must be 'questions of law or fact common to the class.'" *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1080 (6th Cir. 1996). Plaintiffs maintain that there are numerous common factual and legal issues in this case, which include the following:

> [W]hether the conspirators conspired to and did engage in a pattern of deceptive transactions that had the intended effect of granting illegal rebates exclusively to certain large customers; whether paying rebates only to certain large customers violated Ohio laws mandating across-the-board rebates for all customers receiving like service; whether the conspirators' conduct has violated the RICO Act and the Ohio Corrupt Practices Act; whether the conspirators have attempted to mislead their electric ratepayers and the general public about, and conceal the existence of, their fraudulent, illegal, and corrupt scheme; whether the conspirators' scheme has resulted in substantial detriment and harm to hundreds of thousands of southwestern Ohio businesses, political subdivisions, public institutions, and individual consumers who did not receive the rebates that the large customers received; and whether punitive damages should be assessed against Duke.

(Pl.'s Mot. for Class Cert. at 24.)

In response, Duke argues that Plaintiffs cannot show commonality (1) under *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011); (2) in the proposed damages claims of the entire class; (3) in the proposed injunctive relief claims of the entire class; and, (4) in the claims of the Business Competitor Subclass.

7

### 1. Applicability of *Wal-Mart Stores, Inc. v. Dukes*

Duke contends that application to this case of the standards set forth in *Wal-Mart* prevent Plaintiffs from showing the commonality required under Rule 23(a)(2). Duke argues that "[c]ommon questions alone are 'not sufficient to obtain class certification' under Rule 23(a)(2). Rather the 'common contention' that is shared by the class must 'generate common *answers* apt to *drive the resolution of the litigation.*'" (Def. Mem. in Opp. at 7) (citing *Wal-Mart*, 131 S.Ct. at 2551) (emphasis added by Duke). Duke then frames the question that will "drive the resolution of the litigation" as "whether the members of the putative class suffered any injury." *Id.* at 8 (citing *Wal-Mart*, 131 S.Ct. at 2551.) Duke continues:

> Plaintiffs argue otherwise, contending that they must only prove "a single issue common to all members of the class" to satisfy Rule 23(a)(2)'s test, and that they can satisfy the test with common proof that Duke paid rebates that were illegal. Mot. at 22-25 (citing *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003)). That is incorrect. Under *Wal-Mart*, a class may be certified only on a common question that generates a "common answer" to how and why the class members were injured. *Wal-Mart*, 131 S. Ct. at 2552 (common question must "produce a common answer to the crucial question *why was I disfavored.*"). Although all class members allege that Duke engaged in a single course of conduct, that does not establish a "common answer" as to how the individual class members were injured.

*Id.* at 8.

Duke's arguments are not well taken. While Duke is correct that *Wal-Mart* clarified the commonality standard under Rule 23(a)(2), the plaintiffs' claims in *Wal-Mart* are fundamentally different from those in this case, which makes the case distinguishable on the points upon which Duke relies. That is, the *Wal-Mart* plaintiffs were female employees who brought sex discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, seeking injunctive and declaratory relief, back pay, and punitive damages from their employer.

8

The Court held, *inter alia*, that 23(a)(2)'s commonality requirement was not met because resolution of the plaintiffs' gender-based Title VII claims depended on the reasons for each particular employment decision. That the plaintiffs wished to sue over "literally millions of employment decisions at once" concerned the Supreme Court because "without some glue holding the alleged reasons for all those decisions together, it [would] be impossible to say that examination of all the class members' claims for relief [would] produce a common answer to the crucial question *why was I disfavored*." *Wal-Mart*, 131 S.Ct. at 2552 (emphasis in original).

By contrast, the claims before this Court do not require an examination of the subjective intent behind millions of individual decisions; rather, the crux of this case targets a single uniform company practice, *i.e.*, Duke's alleged selective payment of rebates to the large favored customers, rather than across the across-the-board payment of rebates to all residential and non-residential customers. Plaintiffs' claims "depend on a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S.Ct. at 2545. Therefore, the principles articulated in *Wal-Mart* support a finding of commonality here.

### 2. Damages Claims Asserted On Behalf Of The Entire Class

Plaintiffs asserts damages claims under RICO and the OCPA, and also under theories of common-law fraud and civil conspiracy. As Duke articulates, "the full class is seeking damages on the theory that Duke was 'legally mandated' to pay rebates to all residential and non-residential customers 'across the board.'" (Duke's Mem. in Opp. at 6–7.) Duke maintains that Plaintiffs cannot certify this damages class because Plaintiffs' "request for 'across-the-board'

9

rebates is not legally cognizable, and their only legally cognizable claim requires proof of competitive injuries." *Id.* at 13. Plaintiffs reply that Duke is asking this Court to delve into the merits of the proposed class's claims under the guise of determining class certification. This Court agrees.

First, the Court rejects Duke's invitation to address whether Plaintiffs have alleged a legally cognizable claim. Duke made this same argument on appeal and the Sixth Circuit rejected it. The Sixth Circuit found that Plaintiffs' alleged claims, all of them, were ones upon which relief could be granted.

Second, Duke contends that to certify the class, the Court must determine whether, "as a matter of law," class members can "state a claim simply by proving that others received rebates that they did not." (Duke's Mem. in Opp. at 14.) Duke relies upon, for example, *Interstate Commerce Comm'n v. U.S. ex rel. Campbell*, 289 U.S. 385 (1933), for the proposition that "each class member must prove they suffered competitive harm as a result of a rebate paid to others." *Id.* at 14–15. As a further example, Duke also urges the Court to hold that, "even if Plaintiffs could narrow the full class into subclasses of non-residential customers only, it would be impossible for them to establish that each class member suffered the 'same injury,'" given that the option recipients, according to Duke, "assume[d] the risk of an upward trend in market prices in exchange for an option payment." *Id.* at 22.

The Court finds that Duke's arguments go to the merits of Plaintiffs' claims, which is not an appropriate inquiry at the class certification stage. "'Merits questions may be considered to the extent - but only to the extent - that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *In re Whirlpool Corp. Front-Loading Washer*

*Products Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013). Duke will have its opportunity to argue to the Court that Plaintiffs' claims alleging other than competitive harm have no merit or to establish its defense based on the risk tolerance of ratepayers. Here, however, the Court can resolve the commonality issue that Duke raises without resolving the validity of Duke's "competitive harm" or "risk tolerance" arguments. All that counts at this stage is that these arguments, like others pertinent to Plaintiffs' claims and Duke's defenses, will be resolvable, when the time comes, on a classwide basis.

As to that inquiry, the entire proposed class's RICO, OCPA, and common-law fraud claims, each depends on contentions common to all class members that are resolvable on a classwide basis using common proof. Plaintiffs allege that by selectively paying secret rebates to large favored customers through DERS, Duke acted contrary to its express representations to its ratepayers and to the courts, thus committing acts necessary to support the proposed class's RICO and OCPA claims (including the predicate acts of mail and wire/telecommunications fraud, money laundering, and obstruction of justice) and the proposed class's common-law fraud claim.

The common allegations upon which these three claims rely include: that Duke has committed fraud against all of its ratepayers by misrepresenting the subject charges as mandatory, when in fact it rebated those same charges to the favored customers; that by secretly making these rebate payments through DERS, Duke has violated state and federal money laundering statutes; and that by lying about these secret rebate agreements in judicial proceedings, Duke has obstructed justice. *See Williams*, 681 F.3d at 802–04 (describing these

11

claims). These contentions, which are common to every single member of the proposed class, will generate common answers that necessarily will drive resolution of this lawsuit. *Wal-Mart*, 131 S.Ct. at 2551. Inasmuch as the same proof establishes each of these common contentions for all class members in one stroke and no individualized, class member-by-class member proof is needed, the entire class will prove, or fail to prove, its RICO, OCPA, and common-law fraud claims together.

With respect to the proposed class's common-law civil conspiracy claim, it likewise depends on a common contention, albeit one different from those on which the RICO, OCPA, and common-law fraud claims depend. The civil conspiracy claim hinges on the contention that each time Duke made a rebate payment through DERS to one of the large favored customers, rather than across the board, it violated the same Ohio anti-rebate statutes, Ohio Rev. Code §§ 2905.32 and 2905.33(A), allegedly contravening every class member's right to a rebate (*i.e.*, via across-the-board rebates). Thus, as with the proof in the other common-law claims, the entire class will prove, or fail to prove, its common-law civil conspiracy claim together.

### 3. Injunctive/Declaratory Relief Claims Asserted On Behalf Of The Entire Class

In addressing "[t]he full class['s] claims for injunctive and declaratory relief under RICO and various state law theories," Duke offers two additional arguments against a finding of commonality. (Duke's Mem. in Opp. at 16.) First, Duke claims its residential ratepayers "are not within the class of persons conceivably injured by rebates paid to customers in non-residential tariff groups." *Id.* at 20. Second, it maintains that no disfavored ratepayer (whether residential or non-residential) would have standing to claim injury from Duke's violation of Ohio Rev. Code §§ 2905.32 and 2905.33(A), absent a showing that "it is similarly

12

situated to a rebate recipient," which, according to Duke, inherently requires "individualized proof." *Id.* at 18.  Plaintiffs disagree with the premise of these two additional arguments – that the members of the proposed class "are not similarly situated to a rebate recipient" or, at least, that it would take "individualized proof" to show that they are – but contends that the issue relates to the merits of their claims, which is not the issue before this Court.  Plaintiffs maintain that the salient point for determining commonality is that these claims cut across the tariff groups to which all Duke ratepayers in the proposed class belonged.  This Court agrees.

The rebated charges cut across every one of Duke's tariff groups, enabling every allegedly disfavored Duke ratepayer to assert the same contentions regarding the rebates and to seek the same answers concerning the legal significance of the same alleged unlawful and fraudulent conduct, without any need for individualized proof.  Plaintiffs' requests for injunctive and declaratory relief on behalf of the entire class are based on common contentions; that is, that "Duke Energy has violated Ohio Rev. Code §§ 4905.32 and 4905.33(A)" and that "by entering into and carrying out these unlawful side deals," Duke "acted on grounds generally applicable to the class . . . as a whole . . . ."  (Second Am. Compl. at 31, Prayer for Relief, at h.)  These contentions are aimed at "halting the [rebate] scheme and reversing its harmful effects," *id.* at 31; and they can be resolved in one stroke, *i.e.*, by "an order preliminarily and permanently enjoining Duke Energy and all persons or entities in active concert or participation with them, from engaging in, carrying out, or renewing" any rebate agreements.  (*Id.*, Prayer for Relief at i.)  As was the case in the damages class, here too the entire class will prove, or fail to prove, its entitlement to this relief together.

### 4. Business Competitor Subclass

Plaintiffs allege that Duke violated the RPA by (1) by discriminating in the price of electricity in contemporaneous sales to competing purchasers in interstate commerce, 15 U.S.C. § 13(a), and (2) by engaging in commercial bribery, 15 U.S.C. § 13(c). (Second Am. Compl. ¶ 50.) As a remedy, Plaintiffs seek injunctive and declaratory relief on behalf of business ratepayers who have competed with the favored customers that received the rebates via the Option Agreements.

Duke argues Plaintiffs cannot prove competitive injury without individualized evidence of actual competition between each Subclass member and a rebate recipient. Specifically, Duke contends:

> There are three elements to a claim under the RPA: "(1) a violation of the antitrust laws . . .; (2) individual injury resulting from that violation, and (3) measurable damages." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008). In an RPA case such as this one—which alleges "secondary-line" price discrimination between "favored purchaser[s]" and "disfavored purchaser[s]"—"the plaintiff[,] who is the disfavored purchaser, must show that it competes with the favored purchaser." *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 521 (6th Cir. 2004) (per curiam) (emphasis added). The plaintiff must further prove that the discrimination between the favored and disfavored purchasers had an impact on that market. *See Volvo* [*Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*], 546 U.S. [164,] 181 [(2006)].
>
> Both required showings necessitate individualized proof. To establish that a member of the Subclass "competes" with a rebate recipient, Plaintiffs must define the competitive market in which that Subclass member does business and prove that at least one rebate recipient participates in that market. *See Lewis*, 355 F.3d at 521 (citing 14 Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 2333b3 (1999)). To prove competitive impact, each class member must show how much the rebate altered that market. *Volvo*, 546 U.S. at 181.

(Duke's Mem. in Opp. at 9–10). Duke concludes that the Business Competitor Subclass's "RPA claims are not susceptible of classwide proof because 'the presence of individualized market

14

conditions' almost invariably 'require[s] individualized, not common, hypothetical markets [and] thus individualized, not common, evidence.'" *Id.* at 10 (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 574 (8th Cir. 2005)).

Plaintiffs reply that, *inter alia*, the cases upon which Duke relies are cases in which the plaintiffs were requesting damages – which Plaintiffs here do not request, and Duke ignores Plaintiffs' claim for *per se* liability under § 2(c) of the RPA. This Court agrees.

At this point in the analysis, the Court finds that it is necessary to touch aspects of the merits of Plaintiffs' claims, but "only to the extent[] that they are relevant in determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc.*, 133 S.Ct. at 1194–95. The majority of discriminatory pricing cases under the § 2(a) of the RPA, and all of those cited by Duke, address only damages claims, which are recognized almost universally as ill-suited for class action treatment.

In reviewing the cases addressing the issue before this Court, *i.e.*, whether a class seeking injunctive relief under the RPA is appropriately certified, the cases explain that "[t]he showing required to establish a substantive right to injunctive relief under the Robinson–Patman Act is less stringent than the showing required in an action for damages." *Mad Rhino, Inc. v. Best Buy Co., Inc.*, CV 03-5604 GPS AJWX, 2008 WL 8760854, at *5 (C.D. Ca. Jan. 14, 2008). *See also American Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp.2d 1031, 1036 (N.D. Ca. 2001) ( "in order to obtain an injunction for violation . . . of the Robinson–Patman Act, each plaintiff does not need to prove that it was actually injured by the unlawful price discrimination"). Indeed, the RPA, "is a prophylactic statute which is violated merely upon a showing that 'the effect of such discrimination *may* be substantially to lessen competition.'"

15

*Mad Rhino*, 2008 WL 8760854, at \*5 (quoting *American Booksellers Ass'n, Inc., * 135 F. Supp.2d at 1036) (emphasis in original). "Section 2(a) does not 'require that the discriminations must in fact have harmed competition.'" *Id.* (quoting *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Sys., Inc.* 879 F.2d 1005, 1022 (2nd Cir. 1989), citing *Corn Prod. Refining Co. v. FTC,* 324 U.S. 726 (1945); *FTC v. Morton Salt Co.,* 334 U.S. 37, 46 (1948) ("the statute does not require the Federal Trade Commission to find that injury has actually resulted")). "Instead, a plaintiff must show only that there is a reasonable possibility that the price discrimination may harm competition, *i.e.,* that there is a '*competitive injury.*'" *Id.* (quoting *Falls City Indus., Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428 (1983)) (emphasis in original). "Competitive injury may be inferred from 'a substantial price discrimination between competing purchasers overtime.'" *Id.* (quoting *Falls City Indus., Inc.*, 460 U.S. at 435). The *Mad Rhino* court's analysis of this issue is helpful here.

In determining whether the alleged "competitive injury" could be demonstrated on a classwide basis, the *Mad Rhino* court looked to whether the plaintiffs could show "substantial price discrimination between competing purchasers over time.":

> To establish a *prima facie* case of "secondary-line" price discrimination under the Robinson–Patman Act, a plaintiff must prove by preponderance of the evidence that (1) sales were made in interstate commerce, (2) commodities sold to the favored and disfavored purchaser were of the same grade and quality, and (3) different prices were offered to the favored and disfavored customers. *Texaco Inc. v. Hasbrouck,* 496 U.S. 543, 556 (1990).
>
> While the first and the second elements of the price discrimination are not complicated by class issues, the third element involves an individualized determination, which precludes class certification because price discrimination, by which favored customers benefit, may vary from one customer to another, and from one location to another. *The only exception occurs* when a Robinson–Patman defendant maintains two price lists, which are discriminatory on their face and

> demonstrate that the defendant sold its products on better terms to the allegedly
> favored group. *See, e.g., Gold Strike,* 436 F.2d 791. However, where two distinct
> price lists were not maintained, establishing price discrimination involves
> individualized proof and defenses (i.e. allegedly disfavored purchasers must
> demonstrate that the price they were charged was different from that charged to the
> favored group). *See, e.g., Clark v. HP. Hood, inc.,* No. 83–205–C, 1985 WL 6263,
> *1 (D. Mass. September 5, 1983).

*Mad Rhino,* 2008 WL 8760854, at *8 (emphasis added); *id.* at n. 10 ("'Secondary-line' price

discrimination is the sale of a product at different prices resulting in injury to competition

between the 'favored' and 'non-favored' buyers.") (citing as an example *Rebel Oil, Inc. v. Atl.*

*Richfield Co.*, 51 F.3d 1421, 1445 (9th Cir. 1995)).

  The case *sub judice* fits the exception to which the *Mad Rhino* court refers. That is, Duke

kept basically two "price lists" – (1) the 24 favored customers who paid the set rate and received

rebates from the amount charged, and (2) the business subclass who paid the set rates and did not

receive a rebate from the amount charged.

  As to Plaintiffs claim under § 2(c) of the RPA, a strong argument can be made that it does

not require a showing of competitive injury. In *Federal Trade Comm'n v. Simplicity Pattern Co.*,

360 U.S. 55 (1959), the Court "contrasted sections 2(c), (d), and (e) with section 2(a),": "'Unlike

§ 2(a),' the Court wrote, '[neither § 2(c), (d), nor (e)] requires, as proof of a *prima facie*

violation, a showing that the illicit practice has had an injurious or destructive effect on

competition.'" *Fed. Paper Bd. Co., Inc. v. Amata*, 693 F. Supp. 1376, 1386 (D. Conn. 1988)

(noting that the Second Circuit is not alone (quoting *Simplicity Pattern Co.*, 360 U.S. at 65). *See*

*also Philip Morris, Inc. v. Grinnell Lithographic Co., Inc.*, 67 F. Supp. 2d 126, 134 (E.D. N.Y.

1999) ("a *per se* unlawful practice under the Robinson–Patman Act is inherently anticompetitive,

thus obviating the need to *prove* anticompetitive injury when the relief sought is injunctive or

declaratory in nature") (emphasis in original).

Accordingly, the Court finds that Plaintiffs have met their burden of showing that the injunctive/declaratory relief claims of the proposed Business Competitor Subclass meet Rule 23(a)(2)'s commonality requirement.

## B. Fair and Adequate Representation

Rule 23(a)(4) requires that the named plaintiffs demonstrate that they will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). Courts examine two criteria to determine adequacy: "1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Am. Med. Sys.,* 75 F.3d at 1083. One purpose of the adequacy inquiry is "to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem,* 521 U.S. at 625–26; s*ee also Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812 (1985) (noting that adequacy of representation is essential to protect due process rights of absent class members); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996) (adequacy of representation requirement is essential to due process because a final judgment in a class action is binding on all class members).

As Duke correctly points out, the inquiry  "fundamentally is whether the class counsel does and would wield undue influence over the class decision-makers." (Duke's Reply in Support of Supp. Mem. in Opp. at 4.) To support its contention that the class representatives are inadequate, Duke relies most heavily on *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246 (11th Cir. 2003) ("courts fear that a class representative who is closely associated with the class attorney will allow settlement on terms less favorable to the interests of absent class members")

18

and *Susman v. Lincoln American Corporation*, 561 F.2d 86, 91 (7th Cir. 1977) ("Courts . . . fear .

. . the danger of champerty [when there is a] . . . close relationship between the putative class

representative and counsel.").

There are four named plaintiffs in this case: (1) Anthony Williams; (2) Aikido of

Cincinnati, a non-profit organization that teaches the Japanese martial art of Aikido; (3) BGR,

Inc., a packaging solutions corporation with about 110 employees; and (4) Munafo, Inc., a family

owned corporation that sells food and liquor in the same geographic market as Kroger, BP, and

Marathon/Speedway, three of the favored customers. Duke contends that, similar to the named

plaintiffs in *London* and *Susman*, the named plaintiffs' relationship with Randolph Harry

Freking, one of the eight designated "lead counsel" in this action, renders them unable to "fairly

or adequately protect the interests of the thousands of unnamed class members they purport to

represent." (Duke's Supp. Mem. in Opp. at 3.) Specifically, Duke addresses the named

plaintiffs' personal relationships with Mr. Freking and their alleged lack of knowledge of this

lawsuit.

### 1. **Personal Relationships**

The relationships at issue here are the following: Anthony Williams and Mr. Freking

were neighbors from 2000 to 2009. Charles McGinnis, a partner at the same firm as Mr. Freking,

has served as head instructor at Aikido of Cincinnati since 1987 and is currently the President of

the organization. Dean Backscheider is the Vice President and Treasurer for BGR, Inc. and he

has been friends with Mr. Freking for over 50 years. And, Christopher Munafo is the Secretary

of Mufano, Inc. and was previously a client of Mr. Freking.

Initially, the Court notes that there are two law firms that represent Plaintiffs in this

19

action: Markovits, Stock & DeMarco LLC and Freking & Betz. Of the 182 docket entries in this action, Paul M. DeMarco of the firm Markovits, Stock & DeMarco LLC, has moved, responded, or replied on behalf of Plaintiffs in the significant majority of those filings. There is no claim that Mr. DeMarco's firm, or any member of it, had a any relationship with the named plaintiffs or their representatives.

As to Mr. McGinnis, Mr. Backscheider, and Mr. Munafo, none are named plaintiffs in this action. As Plaintiffs correctly point out, Duke has completely disregarded corporate separateness. Mr. Freking's relationship with these individuals is far less likely to have any impact on the corporations' ability to fairly and adequately represent the class. Indeed, the fact that the named plaintiffs are not the individuals with whom Mr. Freking has a relationship, distinguishes this action from *London* and *Susman*, where the proposed class representatives had long-standing and close relationships (in some instances, familial relationships) with proposed class counsel, and the class representatives themselves were all the named plaintiffs. *See London*, 340 F.3d 1246 (named plaintiff deemed inadequate because he was class counsel's close friend *and* former stockbroker); *Susman*, 561 F.2d 86 (all named plaintiffs deemed inadequate: one because he was in the same law firm as class counsel; another because he was class counsel's brother; a third because she was class counsel's mother; and a fourth because he shared office space with class counsel's law firm). In contrast, here, Mr. Freking's relationships are with three individuals who are not named as plaintiffs. None of the cases cited by Duke deemed a corporation to be an inadequate class representative because proposed class counsel had a personal relationship with someone involved in that corporation.

In addition to these reasons, which weigh heavily against a finding that the named

20

plaintiffs cannot fairly and adequately represent the class, the Court looks more closely at the unique aspects of the relationships at issue here. First, while Mr. McGinnis is a partner of Mr. Freking, he is not the designated representative of the named plaintiff in this case. Instead, Virginia Fritz, whom Mr. Freking does not know, is Aikido's representative. Aikido's Board of Directors voted unanimously to be involved in the instant action. Ms. Fritz testified in deposition that she reports to the organization's Chairman and Board of Directors on a monthly basis, where its participation in this case is discussed. These facts, added to those discussed above, do not present a situation where the Court is concerned that proposed class counsel in this case wield undue influence over a class decision-maker.

As to Mr. Munafo, Mr. Freking represented him and his company in the past. However, unlike the relationships in the cases cited by Duke, "there is no evidence that plaintiff has a familial or business relationship with his counsel outside of their attorney-client relationship." *Armes v. Shanta Enter., Inc.*, 07C5766, 2009 WL 2020781, at *4 (N.D. Ill. July 8, 2009) (distinguishing, *inter alia*, *Susman* and *London*). And, similar to the situation in *Armes*, there is no "indication that plaintiff[s'] previous representation by his counsel would cause him to be more interested in maximizing the return to his counsel than aggressively representing the proposed class or incline him to support his attorney's interests over those of the other class members." *Id.*

With regard to Mr. Backscheider, although he is a long-time friend of Mr. Freking, there is no indication that they have had any business dealings in the past. And, as the Court explained *supra*, Mr. Backscheider is not the named plaintiff, but instead is a corporate officer of a corporation that employs over 100 people. There is no indication from Mr. Backscheider's

21

testimony that he is being or would be unduly influenced by his relationship with Mr. Freking. In these particular circumstances, the personal relationship between Mr. Freking and Mr. Backscheider is insufficient to render BGR, Inc. an inappropriate class representative. *See Martz v. PNC Bank, N.A.*, No. 06-1075, 2007 WL 2343800, at 5 (W.D. Pa. Aug. 15, 2007) (named plaintiff deemed inadequate because he was class counsel's close friend *and* he "admits he is not certain if he is a member of the Class he seeks to represent").

Finally, looking to Mr. Freking's relationship with Mr. Williams, who were neighbors and have known each other since 2000, the Court finds no evidence that the relationship is of the type and duration that courts have found disqualifying. *See, e.g.,Sobel v. Hertz Corp.*, 291 F.R.D. 525, 542–43 (D. Nev. 2013) (noting that *London* involved "both personal and business relationships"); *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 309 (S.D. N.Y. 2004) (the fact that the named plaintiff was a "'close personal friend of his attorney'" and that "they socialize together" did not, by itself, render the named plaintiff inadequate as a class representative).

Accordingly, the Court finds that the relationships between Mr. Freking and the named plaintiffs and/or the named plaintiffs' representatives or members do not render them unable to fairly or adequately protect the interests of the unnamed class members.

### 2. Knowledge of Litigation

Next, Duke asserts that "class representatives [must] possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." (Duke's Supp. Mem. in Opp. at 8) (citing *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482–83 (5th Cir. 2001) (vacating district court's grant of class certification because court

incorrectly presumed adequacy of putative representative)). Duke argues that the "[n]amed Plaintiffs' limited knowledge of the case also prevents them from adequately protecting the interests of the class, as it demonstrates that Plaintiffs have ceded complete control over the litigation to lead class counsel." *Id.* Duke contends that "[t]he named Plaintiffs lack even basic knowledge of the[] core allegations of this case." *Id.* at 9. This Court, however, disagrees.

Relying on *Efros v. Nationwide Corp.*, 98 F.R.D. 703, 707 (S.D. Ohio 1983), Duke asserts that "[a] class representative's lack of knowledge about and involvement in the litigation indicates that he or she has given "unfettered discretion" to the attorneys and is not the "driving force" behind the litigation. While this Court in *Efros* did address how a class representative's lack of knowledge about and involvement in the litigation can indicate that he or she has given "unfettered discretion" to the attorneys and is not the "driving force" behind the litigation, the circumstances in that case, and others like it, were distinguishable from those *sub judice*. In that case, the Court was "greatly troubled by the fact that both the Complaint and the Amended Complaint were filed well before Ms. Efros [the named plaintiff] ever spoke with or retained any of the attorneys who are representing her in this case." *Id.* Also problematic was the fact that in the amended complaint the Court found "that many of the claims made by her attorneys are claims that Ms. Efros herself does not want to pursue." *Id.* There are no similar concerns in the present case.

For example, Chris Munafo and his family members own an independent store that sells liquor and food. Mr. Munafo got involved in this case of his own volition. Since becoming involved, Mr. Munafo has reviewed court documents and met with counsel on multiple

occasions, developing his own perspective on why Duke should be held accountable for allegedly

deceiving small businesses like his:

> [T]he reason I got involved is because I know our background. We grew up in the business. We worked our butts off to get where we were. And back then it was a level playing field. And when they said rebates were being kicked back, it destroyed our level playing field, put us at a disadvantage. I figured if it was doing it to us, it was doing it to other independents, other retailers, and it's just not right.
>
> . . . .
>
> Q. And the advantage was what in your mind?
>
> A. Well, it's the fact that they were getting rebates. If we would have got those rebates, we would have had cash flow for capital improvements. We could have done more advertising. We could have updated stores, equipment.
>
> . . . .
>
> Q. . . . And I wanted to ask you, sir, how were you directly injured in your business as a result of the allegations that are set forth in this complaint?
>
> A. Well, if we were given the same percentage of rebates as those – you call them – there's some definition.
>
> Q. I think in this document, in the allegations, they are called favored customers.
>
> A. Favored customers. If we were getting that, we would have more cash flow. We could update the business, better equipment, more efficient equipment, maybe more employees if needed.

(Munafo Depo. at 111, 112-113, 116-117; ECF No. 174-3.)

Similar testimony was given by Ms. Fritz, who testified that the Aikido Board's approval

of the non-profit organization's participation in this case was specifically predicated on the denial

of rebates. (Fritz Dep. at 34–36; ECF No. 173-2) ("I recall that rebates were being given to

particular organizations in the area and that we were not given the opportunity of receiving those

rebates."). She further testified as to Aikido's injury, stating: "Our injury as I see it, sir, is the

fact that other corporations or other organizations in the area received rebates, where Aikido of

Cincinnati wasn't given the opportunity to get rebates." *Id.* at 61.

Mr. Backscheider, testifying as the corporate representative of BGR, also demonstrated

knowledge of plaintiffs' claims as the following example reflects:

> Q. Let me ask you this, sir, what do you understand the – when we are reading the words CRS was kicking back those charges, what do you understand the process to be here? What was going on that you are objecting to?
>
> A. If I understand it correctly, there was a sham company set up that did not generate any revenue. And to the best of my knowledge, the only function of that organization was to write checks, as far as rebates to the companies listed in – I believe that might be exhibit 3. So this company was a – not a truly functioning organization. Its only function was to write rebate checks.

(Backscheider Dep. at 57–58; ECF No. 173-1.) Mr. Backscheider also testified that plaintiffs'

injuries stem from the rebates they did not receive. *Id.* at 62 ("we were not at BGR given the

opportunity for rebates").

Finally, Mr. Williams exhibited sufficient knowledge of the case to adequately represent

the absent class members as shown by, for example, the following:

> Q. What led to your decision to join the lawsuit?
>
> A. Because what transpired with the rebates I think is wrong and unfair to the rest of the people that live in Hamilton County.
>
> . . . .
>
> Q. … And how were you defrauded, sir?
>
> A. We were defrauded from the perspective that we didn't know that those 22 companies were receiving rebates.
>
> . . . .
>
> Q. So if the stipulation was thrown out by the PUCO, and the rates were approved by the PUCO without consideration of the stipulation, how were you harmed?

25

> A. My rates went up. I did not receive a rebate. Those 22 companies, their rates went up. They did receive a rebate.

(Williams Dep. at 23, 32-33, 43-44; ECF No. 173-4.).

In sum, the Court finds that the knowledge exhibited by the named plaintiffs and the representatives of the named plaintiffs reflects their ability and willingness to vigorously prosecute the interests of the class.

## C. Remaining Requirements

The Court next briefly addresses the remaining requirements for class certification, with which Duke, correctly, does not take issue.

### 1. Rule 23(a): Numerosity and Typicality

As Plaintiffs assert, the proposed class here is so numerous that joinder of all members is impracticable. There is no strict numerical test for determining impracticability of joinder. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) (citing Senter, 532 F.2d at 523 n. 24 (and citations therein)). "Rather, '[t]he numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations.'" *Id.* (citing *General Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980)). "When class size reaches substantial proportions, however, the impracticability requirement is usually satisfied by the numbers alone." *Id.* (citation omitted). Plaintiffs allege that hundreds of thousands of disfavored ratepayers spread throughout southwestern Ohio comprise the proposed class. Considering the size of Duke's business in Ohio, this estimate does not seem unreasonable and easily satisfies the numerosity requirement.

As to typicality, Plaintiffs assert that the named plaintiffs' claims against Duke are typical in that Plaintiffs and all of the members of the class were deprived of legally mandated rebates and all are asserting the same legal theory as a result. Thus, Plaintiffs conclude, in prosecuting

26

their claims against Duke, the named plaintiffs will simultaneously advance the class's interests. This Court agrees, finding that "'a sufficient relationship exists between the injury to the named plaintiff[s] and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.'" *Stout v. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000) (quoting *Sprague v. Gen. Motors*, 133 F.3d 388, 399 (6th Cir. 1998)).

### 2. Rule 23(b)

In addition to the requirements under Rule 23(a), Plaintiffs must establish that a class action is maintainable under one of the three prongs of Rule 23(b). Plaintiffs move for class certification under Rules 23(b)(2), 23(b)(1)(A), and 23(b)(3).

### a. Rule 23(b)(2) - Class Injunctive/Declaratory Relief Claims

Certification under Rule 23(b)(2) is appropriate only if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "If the Rule 23(a) prerequisites have been met and injunctive or declaratory relief has been requested, the action usually should be allowed to proceed under subdivision (b)(2)." 7A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1775, at 462. Because Plaintiffs seek injunctive and declaratory relief with respect to the proposed class as a whole (as well as to the Business Competitor Subclass), and the Rule 23(a) prerequisites have been met, the Court finds that certification of the injunctive and declaratory relief portion of this case as a class action under Rule 23(b)(2) is appropriate.

### b. Rule 23(b)(1)(A) - Class Injunctive/Declaratory Relief Claims

A Rule 23(b)(1)(A) class action is utilized when separate actions would create
incompatible standards of conduct for the party opposing the class, or when the interests of the
members not parties to the litigation would be impeded by individual adjudications. *See, e.g., In
re Bendictin Products Liab. Litig.*, 749 F.2d 300, 305 (6th Cir. 1994) (if inconsistent declarations
of liability could result from separate actions, certification of a class may be appropriate). Here,
Plaintiffs contend, and the Court agrees, that separate prosecution of the class's injunctive and
declaratory relief claims would create the risk of inconsistent adjudications that could lead to
incompatible standards of conduct for Duke and its affiliates. Thus, certification under Rule
23(b)(1)(A) is proper as well.

### c. Rule 23(b)(3) - Class Damages Claims

Plaintiffs seek to certify the damages portion of this case under Rule 23(b)(3). The
Court's task under Rule 23(b)(3) is to determine whether common questions of law or fact
predominate over individual ones and whether the proposed class action is superior to other
available methods of adjudication. *See In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 307
(E.D. Mich. 2001). As to the first inquiry:

> There are no bright lines for determining whether common questions predominate.
> Instead, considering the facts of the case presented, a claim will meet the
> predominance requirement when there exists generalized evidence which proves or
> disproves an element on a simultaneous, class-wide basis, since such proof obviates
> the need to examine each class member's individual position. Common questions
> need only predominate: they need not be dispositive of the litigation.

*Id.* (quoting *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 691 (D. Minn.1995) and omitting
internal citations). "The predominance requirement is satisfied unless it is clear that individual

issues will overwhelm the common questions and render the class action valueless." *Id.* (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y.1996)).

In the instant action, the core issues of liability are common to the entire class, *i.e.*, all class members were denied the across-the-board rebates to which they were allegedly entitled. Duke, allegedly improperly, represented the rebated charges as mandatory for all retail ratepayers in its electric service area. Thus, class-wide evidence is sufficient to establish Duke's liability for its allegedly unlawful rebate schemes, as well as the amount of rebates the favored ratepayers received, the amount the disfavored ratepayers did not receive, and Duke's attendant profits. The alleged denial of the rebates would have caused injury to each member of the proposed class identically. Accordingly, because Plaintiffs allege that the conduct of Duke and the other alleged conspirators was part of the same illegal pattern and scheme, the common issues of fact and law arising from that conduct predominate over any individual issues and satisfy the predominance requirement of Rule 23(b)(3).

With regard to Rule 23(b)(3)'s second inquiry, the Court must find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In considering whether a class action is the superior method to employ, a court should consider: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

Having found that common issues of law and fact predominate over individual ones, this Court also finds that a class action is superior to separate trials. A class action is the most efficient and convenient method to resolve this controversy. Repeatedly litigating the same issues in individual suits would produce duplicate efforts, unnecessarily increase litigation costs, impose an unwarranted burden on this Court and other courts, and create a risk of inconsistent results. *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, 411–12 (S.D. Ohio 2007) (finding same) (citing *In re Potash Antitrust Litig.*, 159 F.R.D. at 699; *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. at 325–26 (finding that class action is superior because it ensures fair and efficient adjudication); *In re Carbon Black Antitrust Litig.*, CIV.A.03-10191-DPW, 2005 WL 102966, at *22 (D. Mass. Jan. 18, 2005) (stating that "[a]ntitrust cases are expensive endeavors and joining forces with other similarly situated plaintiffs is often the only way to effectuate a case.")). Further, given the cost and complexity of antitrust litigation, claimants with potentially small claim amounts may abandon otherwise valid claims. *See id.* at 412 And, although this case might prove to be complex, this Court is convinced, in light of the counsel on both sides' exhibited professionalism and the management methods available to this Court, that resolution of this controversy is manageable. *See id.*

## IV.

Based on the foregoing, the Court **GRANTS** Plaintiffs' Renewed Motion for Class Certification (ECF No. 159) and **ORDERS**:

(1) The following class is certified:

All ratepayers who received retail electric generation service from Duke Energy Corp. and/or Cinergy Corp. or their subsidiaries or affiliates at any time between January 1,

2005 and December 31, 2008 in the CG&E/Duke electric service territory and who did not receive rebates under the side agreements.

(2) The following two subclasses are certified:

All business ratepayers who received retail electric generation service from Duke Energy Corp. and/or Cinergy Corp. or their subsidiaries or affiliates at any time between January 1, 2005 and December 31, 2008 in the CG&E/Duke electric service territory and who did not receive rebates under the side agreements.

All residential ratepayers who received retail electric generation service from Duke Energy Corp. and/or Cinergy Corp. or their subsidiaries or affiliates at any time between January 1, 2005 and December 31, 2008 in the CG&E/Duke electric service territory and who did not receive rebates under the side agreements.

(3) The following entities are certified as class representatives: Munafo, Inc., BGR, Inc., Anthony Williams, and Aikido of Cincinnati.

**IT IS SO ORDERED.**

3 - 13 - 2014
_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**