IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Anthony Williams, *et al.*, | : | |
| Plaintiffs | : | Civil Action 1:08-cv-00046 |
| v. | : | Judge Sargus |
| Duke Energy Corporation, *et al.*, | : | Magistrate Judge Abel |
| Defendants | : | |

# Order

Plaintiffs Anthony Williams, BGR, Inc., Munafeo, Inc., and Aikido of Cincinnati bring this action alleging that their electricity supplier, Duke Energy, gave illegal rebates to favored large customers. When Duke sought approval in early 2004 for an electricity rate plan, some large electricity consumers and industry groups opposed it. Duke Energy then reached an agreement with those customers to sell them electricity through Cinergy Retail Services, LLC ("CRS"), and they withdrew their opposition. Later Duke decided not to go forward with the initial agreement but to negotiate "option agreements" with the 22 customers. Plaintiffs contend CRS was a sham corporation Duke Energy set up to funnel tens of millions of dollars of illegal rebates back to the favored large electricity consumers. This matter is before the Magistrate Judge on plaintiff's January 10, 2014 motion to compel Duke to produce documents for which it claims attorney-client privilege or work product protection or, in the alternative, for *in camera*, review of those documents (doc. 175) and defendants' February 18, 2014 motion to strike affidavits attached to plaintiffs' reply brief (doc. 180).

# I.  Summary of argument

In their second set of discovery requests, plaintiffs' Interrogatory No. 17 and Request for Production No. 10 sought documents referring or relating to the options agreements. Plaintiffs now seeks production of 105 responsive documents for which Duke claims either attorney-client privilege or work product protection. These documents relate to one of three legal proceedings: (1) 2003-2008 PUCO Rate Stabilization Plan ("RSP") proceedings; (2) December 2006-September 2008 employment discrimination/whistle-blower lawsuit brought by John Deeds against Duke Energy; and (3) this lawsuit, *Anthony Williams v. Duke Energy Corp., et al.*, 1:08-cv-0046 (S.D. Ohio January 2008-present).

Plaintiffs maintain that the documents should be produced because Duke has failed to present facts establishing the factual predicates for the attorney-client privilege/work product protection and because the documents were created when Duke sought legal advice for the purpose of perpetrating a fraud on them, PUCO, and the Supreme Court of Ohio. Alternatively, plaintiffs seek an *in camera* review of the documents to determine whether they are privileged and, if so, whether they are subject to the crime-fraud exception.

<u>Has Duke demonstrated the documents are privileged</u>? Duke offers the December 17, 2013 Declaration of Ariane S. Johnson's[1] to establish the factual predicates for its claims of attorney-client privilege and work product protection. Plaintiffs argue that Johnson had insufficient involvement with the communications to be in a position to assert the factual

---

[1]Doc. 176-2, PageID 3630-41.

predicates for the claims of attorney-client privilege and work product protection. Johnson has been employed in Duke's legal department from May 2003 to the present.[2] Although she was not centrally involved in the PUCO proceedings or this lawsuit, Johnson was personally involved in the *Deeds* litigation.[3] She is knowledgeable about the responsibilities of the individuals who authored and received the emails at issue,[4] and the legal proceedings they are said to relate to.[5] Johnson asserts that the three legal proceedings "resulted in numerous internal discussions among and between and involving the listed attorneys and paralegals, the attorneys and clients, and the attorneys and their supervising attorneys . . . ."[6] Clients in the public relations department sought legal advice from Johnson and other members of the legal department about the press releases Deeds' attorney frequently issued.[7] Finally, Johnson states: "I have reviewed the challenged documents on the privilege log that Duke has submitted in this matter and have attempted to group them to better explain the privileges."[8]

---

[2]Ariane S. Johnson's December 17, 2013 Declaration, p. 1, ¶ 2, Doc. 176-2, PageID 3630. She was first employed in that department by Cinergy Corporation and later by Duke. *Id.*, ¶¶ 2-3.

[3]*Id.*, p. 2, ¶ 9, PageID 3631.

[4]*Id.*, pp. 2-6, ¶¶ 7-10, PageID 3631-35.

[5]*Id.*, pp. 6-8, ¶¶ 11-27, PageID 3635-37.

[6]*Id.*, p. 8, ¶ 28, PageID 3637.

[7]*Id.*, ¶ 29.

[8]*Id.*, p. 8, ¶ 30, PageID 3637.

## II.  Attorney-client privilege, crime-fraud exception, and work product protection: Legal principles

**Elements of attorney-client privilege.** Questions of attorney-client privilege are mixed questions of law and fact. In federal court, questions of privilege are determined by the federal common law. The factual predicates for a claim of attorney-client privilege are:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived. *Fausek v. White,* 965 F.2d 126, 129 (6th Cir. 1992)(citing *United States v. Goldfarb,* 328 F.2d 280, 281 (6th Cir. 1964)).[9]

It is often said that the attorney-client privilege should be construed narrowly.[10]

The attorney-client privilege applies both to "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance,"[11] and "to lawyer-to-client communications that reveal, directly or indirectly, the substance of a confidential communication by the client."[12]

**Plaintiffs' arguments**. Plaintiffs argue that Johnson's declaration asserts insufficient facts to establish the factual predicates necessary to support a claim of attorney-client privilege. She did not participate in the email exchanges or in the underlying legal proceedings

---

[9] *Reed v. Baxter,* 134 F.3d 351, 355-56 (6th Cir. 1998). See,  *Guy v. United Healthcare Corp.,* 154 F.R.D. 172, 177 (S.D. Ohio 1993)(King, Magistrate Judge).

[10] *Fausek v. White,* 965 F.2d at 129.

[11] *Fisher v. United States*, 425 U.S. 391,403 (1976) (citations omitted).

[12] *Beery v. Thomson Consumer Elecs., Inc.*, 218 F.R.D. 599, 603 (S.D. Ohio 2003) (quoting *Am. Standard Inc. v. Pftzer Inc.*, 828 F.2d 734, 745 (Fed. Cir. 1987)).

and business transactions they were about,[13] and her declaration does not assert facts specific to particular emails. It is often not possible to determine from the declaration whether defendants are asserting the attorney-client privilege, work product protection, or both. Her "brief descriptions" of the emails are often conclusory, vague and unclear about their subject matter and the purpose. Johnson had no knowledge of whether the non-lawyer participants in the communications were aware that they were for the purpose of seeking or obtaining legal advice. Finally, her declaration provides insufficient facts for the court to determine whether the documents were in the ordinary course of business or primarily for business purposes, rather than the primary purpose of obtaining legal advice.

Plaintiffs maintains that a corporation asserting attorney-client privilege must prove that the employee knew the communication was for the purpose of obtaining legal advice. *American Municipal Power, Inc. v. Bechtel Power Corp.*, 2012 WL 6059357, *2 (S.D. Ohio December 6, 2012); *Graff v. Haverhill North Coke* Co., 2012 WL 5495514, *7 (S.D. Ohio November 13, 2012); *Henderson Apartment Ventures, LLC v. Miller*, 2012 WL 222302 (D. Nev. January 24, 2012); *See, In re Perrigo*, 128 F.3d 430, 437 (6th Cir. 1997). Communications to a lawyer for business purposes are not privileged. Documents prepared and emailed for review by both legal and nonlegal employees are often held to be not privileged because the communications were not made for the primary purpose of seeking legal advice. *North*

---

[13]Johnson had some, unspecified involvement in the *Deeds* litigation and was involved "peripherally in certain Public Utilities Commission of Oho ("PUCO") proceedings." Johnson Decl., ¶ 9, doc. 175-1, PageID 3631.

*Carolina Elec. Membership Corp. v. Carolina Power & Light Co.*, 110 F.R.D. 511, 514 (M.D. N.C. 1986). Documents whose "primary purpose" was "business negotiations" rather than "legal advice" are not privileged.  *United States v. Davis*, 131 F.R.D. 391, 401 (S.D. N.Y. 1990). Plaintiffs argue that discovery suggests that the withheld communications were made for business purposes and not because of any legal proceedings.

<u>Defendants' arguments</u>. Defendants maintain that the case law does not support plaintiffs' argument that there is a ninth requirement: That in a corporate setting, the attorney-client privilege does not apply unless the employees with whom the in-house lawyer was communicating were aware that the communication was for purposes of obtaining legal advice.[14] Consequently, defendants argue, the court should reject plaintiffs' argument that Duke has failed to support its assertions of attorney-client privilege because Ms. Johnson lacks the personal knowledge about whether the employees who were communicating with Duke's in-house counsel were aware that the communication was for purposes of obtaining legal advice.[15]

Defendants argue that the two cases on which plaintiffs rely, *Am. Mun. Power, Inc. v. Bechtel Power Corp.*, No. 2:11-cv-131, 2012 U.S. Dist. LEXIS 173082, at *5 (S.D. Ohio December. 6, 2012), and *Henderson Apartment Venture, LLC v. Miller*, No. 2:09-cv-01849-HDM-PAL, 2012 U.S. Dist. LEXIS 8276, at *10-11 (D. Nev. Jan. 24, 2012), both cite to the United States Supreme Court's opinion in *Upjohn v. United States*, 449 U.S. 383,

---

[14]Plaintiffs' January 10, 2014 Motion to Compel, p. 15, PageID 3568 (citation omitted).

[15]*Id.*, p. 22 (citation omitted).

394 (1981). Both cases mention plaintiffs' asserted ninth factor in passing--the issue plays no part in either court's determination of the application of the attorney-client privilege. Both cases imprecisely describe the holding in *Upjohn*.

According to defendants, the issue in *Upjohn* was whether the Upjohn Company could assert attorney-client privilege for questionnaires that the Company's attorneys sent out to its general and area managers to investigate allegations that the company had bribed foreign government officials.[16] In finding that the questionnaires were privileged, the Supreme Court reversed the Sixth Circuit's opinion, which had held that a corporation may assert the attorney-client privilege only for communications between its attorneys and senior management.[17] The Supreme Court found that the "control group" test adopted by the Sixth Circuit would interfere with attorneys' ability to obtain necessary information from low- and middle-level employees, and corporations' ability to communicate legal advice to those same employees.[18] The Court then concluded that the managers' responses to the questionnaires were privileged because they were "made by Upjohn employees to counsel for Upjohn acting as such, at the direction of corporate superiors in order to secure legal advice from counsel."[19] In reaching that conclusion, the Court noted that "[t]he communications concerned matters within the scope of the employees' corporate duties, and

---

[16]See *Upjohn*, 449 U.S. at 386--87.

[17]*See id.* at 390--92.

[18]*See id.* at 391-92.

[19]*Id.* at 394 (footnote omitted).

the Circuit would interfere with attorneys' ability to obtain necessary information from low- and middle-level employees, and corporations' ability to communicate legal advice to those same employees.[20] The Court then concluded that the managers' responses to the questionnaires were privileged because they were "made by Upjohn employees to counsel for Upjohn acting as such, at the direction of corporate superiors in order to secure legal advice from counsel."[21] In reaching that conclusion, the Court noted that "[t]he communications concerned matters within the scope of the employees' corporate duties, and the employees themselves were sufficiently aware that they were being questioned in order that the corporation could obtain legal advice."[22]

The *Upjohn* Court did not include the employees' subjective awareness of the purpose of the communications an essential element in proving the application of the attorney-client privilege to communications in a corporate context, and subsequent applications of the *Upjohn* holding have not treated it as such. For example, in an opinion issued the following year, the Southern District of Ohio found that whether a company, its counsel and the company's litigation consultant "were aware of the legal implications of [purportedly privileged] communications when made, particularly with respect to potential litigation," was one of several relevant considerations under *Upjohn*.[23] This Court held, however, that

---

[20]*See id.* at 391-92.

[21]*Id.* at 394 (footnote omitted).

[22]*Id.*

[23]*Baxter Travenol Labs., Inc. v. Lemay*, 89 F.R.D. 410,414 (S.D. Ohio 1981) (citing *Upjohn*, 101 S. Ct. at 689). The issue that was *Travenol's* focus was whether the attorney-

a communication need not match all of the circumstances present in Upjohn in order to be attorney-client privileged. Ultimately, this Court held, a "communication should be protected . . . as long as the communication is made by the client's employee, qua employee, at the client's behest, in order to secure legal advice, and such communication is intended by the client and participants to be confidential."[24]

While defendants maintain that they have made a sufficient factual showing that the communications were attorney-client communications, plaintiffs assert instead that Duke has not demonstrated that the communications were "primarily for the purpose of securing or conveying legal advice rather than business information.

**Rationale for Privilege.** Loyalty is intrinsic to an attorney-client relationship. It is offended if a party can use the opponent's lawyer to make a case.[25] Second, the privilege encourages clients to make full disclosures to their lawyers.[26]

**Costs of Enforcing the Privilege.** The privilege excludes relevant evidence. It creates impediments to the search for truth. Costs increase when an organization with

---

client privilege applied to communications to a former employee who was acting as a consultant to the corporation.

[24]*Id.*

[25]*Reed v. Baxter,* above, citing *McCormick on Evidence* §87.

[26]*Swidler & Berlin v. United States,* 524 U.S. 399, 403 (1998); *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981)(The purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observances of the law and administration of justice."); *Reed v. Baxter,* above.

many members asserts the privilege.[27] However, the U.S. Supreme Court has held that the loss of evidence is justified, in part, because communication might not have been made without the privilege.[28] The Court also noted that although there is a good deal of informed speculation about whether narrowing the privilege would deter honest communications from clients to lawyers, there is little or no empirical evidence supporting that view. *Id.*

**Burden Demonstrating Applicability of the Attorney-Client Privilege.** The party asserting the privilege has the burden of proving each element of the claim. The claim of privilege must be made question-by-question and document-by-document.[29]

**Factual showing needed to demonstrate that a communications is privileged.** Conclusory descriptions of documents in a privilege log are insufficient to meet the producing party's burden of establishing that the document was an attorney-client communication. *In re Search Warrant Executed at Law Offices of Stephen Garea*, 1999 WL 137499, *1-*2 (6th Cir. March 5, 1999). The party asserting privilege "must make a minimal showing that the communication involved legal matters. This showing is not onerous and may be satisfied by as little as a statement in the privilege log explaining the nature of the legal issue for which advice was sought." *Id*. That showing "must provide the reviewing court with enough information for it to make a determination that the document in question was, in

---

[27]*Reed v. Baxter,* above.

[28]*Swidler & Berlin v. United States, 524* U.S. at 408*.*

[29]*United States v. Lawless,* 709 F.2d 485, 487 (7th Cir. 1983).

fact, a confidential communication involving legal advice. *Id.*, *2.

**Elements of attorney-client privilege: Decision.**

While the participants' understanding of the purpose of a communication is a factor in determining whether the communication is privileged, a corporation asserting attorney client privilege does not have to show as a factual predicate that lower level employees subjectively believed that the communication was an attorney-client communication. The *Upjohn* decision applied an objective test. The question is whether corporate management is communicating with in-house counsel and causing lower lever employees to participate in the communications for the primary purpose of getting legal advice. This is an objective inquiry. Of course, if a lower level employee subjectively believed that the primary purpose of the communication was to make a business decision and that in-house counsel are being kept in the loop so that they are knowledgeable about the status of the business decision and that understanding is consistent with the substance of the communication, that would weigh heavily toward a finding that the communication was not privileged.

**Work product protection.**

Work product is protected by Rule 26(b)(3)[30] and

---

[30]That rule provides, in relevant part:

> (3) **Trial Preparation: Materials.**
> (A)  Ordinarily, a party may not discover documents . . . that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).  But, subject to Rule 26(b)(4), those materials may be discovered if:
> (I)  they are otherwise discoverable under Rule

11

Rule 26(b)(4)(B)[31], Fed. R. Civ. P., respectively. Work product is a protection, not a privilege. It is intended to protect the adversary system. As Justice Jackson said in *Hickman v. Taylor*, 329 U.S. 495, 516 (1947), "[d]iscovery was hardly intended to enable a learned profession to perform . . . on wits borrowed from the adversary." It applies only to "documents and tangible things," Rule 26(b)(3), not to a witness's testimony.

When a claim of work product protection is made, the initial burden is on the party seeking discovery to show that the material requested is relevant within the meaning of

--------

26(b)(1); and

(ii) the party shows that has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

[31]That rule provides in relevant part:

(4) **Trial Preparation: Materials**.

(A) *Experts Who May Testify*. A party may depose any person who has been identified as an expert whose opinions may be presented at trial. If Rule 26(a)(2)(B) requires a report from the expert, the deposition may be condu8cted only after the report is provided.

(B) *Expert Employed Only for Trial Preparation*. Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial. But a party may do so only:

(I) as provided in Rule 35(b); or

(ii) on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.

12

Rule 26(b)(1), Fed. R. Civ. P.[32] Once that showing is made, the burden shifts to the party asserting work product "to show that the material was 'prepared in anticipation of litigation or for trial' by or for that party or that party's representative, including that party's attorney, consultant, surety, indemnitor, insurer or agent."[33] The question is "whether, in light of the nature of the document and the factual situation in the particular case, the documents can fairly be said to have been prepared or obtained because of the prospect of litigation."[34] If the objecting party meets this burden, the requesting party then has the burden of showing that he

> (a) has substantial need of the materials in preparation of the party's case, and (b) that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

847 F.2d at 339-40. Under no circumstances may the court "permit discovery of 'mental impressions of an attorney or other representative of the party concerning litigation.'" 847 F.2d at 340. The objecting party has the burden of proving that the documents contain the mental impressions of his lawyer. *Id.*

## III. Crime-Fraud Exception

**Showing Necessary for Crime-Fraud Exception *In Camera* Review.** The moving party must make a factual showing adequate to support a good faith belief that the *in*

---

[32] *Toledo Edison v. G A Technologies, Inc.*, 847 F.2d 335, 339 (6th Cir. 1988).

[33] *Id.*

[34] 8 Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d § 2024 at n 10.

*camera* review will reveal evidence that would establish the crime-fraud exception applies.[35] Groundless fishing expeditions should not be permitted.[36]

**Crime-fraud exception.**

The attorney-client privilege "protects communications relating 'to a fact of which the attorney was informed by his client, without the presence of strangers, for the purpose of securing primarily either an opinion of law or legal services, or assistance in some legal proceeding, and not for the purpose of committing a crime or tort.'"[37] To overcome an otherwise valid claim of attorney-client privilege or the work-product protection on this basis, a plaintiff must (1) make "a prima facie showing that a sufficiently serious crime or fraud occurred to defeat the privilege" and (2) establish "some relationship between the [attorney-client] communication at issue and the prima facie violation."[38] The party assert-ing that the crime-fraud exception applies must show that "the party sought legal advice in furtherance of the crime or fraud."[39] The party must demonstrate that there was a "'close relationship' between the communications and the client's illegal activities" and that "the

---

[35]*United States v. Zolin,* 491 U.S. 544, 572 (1989); *In re Richard Roe, Inc.,* 68 F.3d 38, 40-41 (7th Cir. 1995).

[36]491 U.S. at 571.

[37]*Guy v. United Healthcare Corp.*, 154 F.R.D. 172, 177 (S.D. Ohio 1993) (quoting *United States v. United Shoe Machine Corp.*, 89 F. Supp. 357, 358 (D. Mass. 1950)).

[38] *In re Antitrust Grand Jury*, 805 F.2d at 164 (*citing In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985)); *Safety Today, Inc. v. Roy*, No. 2:12-cv-510, 2013 U.S. District LEXIS 147765, at *18-19 (S.D. Ohio October. 11, 2013).

[39]*SEC v. Sierra Brokerage Servs., Inc.*, No. 2:03-cv-326, 2005 U.S. District. LEXIS 23866, at *22 (S.D. Ohio October. 18, 2005) (citing *In re Antitrust Grand Jury*, 805 F .2d at 168) (other citation omitted).

communications with counsel were intended in some way to facilitate or to conceal criminal activity."[40]

The mere assertion that a crime or fraud has occurred is not enough to overcome a valid attorney-client privilege and work produce claims.[41] "To drive the privilege away, there must be 'something to give color to the charge;' there must be 'prima facie evidence that it has some foundation in fact.'" *Id*. (Citations omitted).

**Plaintiffs' argument.** Plaintiffs argue that the decision of the Sixth Circuit remanding this case to the district court establishes the relevance of the documents sought and the applicability of the crime fraud exception to the attorney-client privilege. First, plaintiffs read that decision to hold that the illegal rebates they challenge were not rates subject to PUCO jurisdiction;[42] consequently, this court has jurisdiction over their federal claims under the Robinson-Patman Act ("RPA") and the RICO Act and their state-law claims for civil conspiracy, violation of the Ohio Corrupt Practices Act, and common-law fraud.[43] Plaintiffs argue that the Sixth Circuit's finding that they properly alleged money laundering and telecommunications fraud as a predicate to their civil RICO and Ohio Corrupt-

---

[40]*United States v. Skeddle*, 989 F. Supp. 912, 903--04 (N.D. Ohio 1997) (citations omitted).

[41] *See Clark v. United States*, 289 U.S. 1, 15 (1933).

[42]The Sixth Circuit characterized plaintiffs' claims as challenging "payments made outside of the rate scheme" that "amount to an 'indirect rebate.' . . . Plaintiffs are arguing that Defendants, in violation of the law, indirectly granted rebates to favored large customers." *Williams*, 681 F.3d at 797.

[43]*Williams v. Duke Energy International, Inc.*, 681 F.3d 788, 797-798, 799-805 (6th Cir. 2012).

Practices Act claims,[44] supports their argument that the crime-fraud exception to the

attorney-client privilege applies. The Sixth Circuit held that plaintiffs had plead facts that,

if proved, would amount to violations of civil RICO and the Ohio Corrupt Practices Act:

> [T]he alleged transfer of money from favored customers to Duke, and from
> Duke to DERS, and from DERS back to the favored customers as 'rebates'
> tainted the funds, which became the 'proceeds' of unlawful activities. Mail
> fraud constitutes an 'unlawful activity' according to 18 U.S.C. §§ 1956(c)
> (7)(A) and 1961(1). Thus, taking as true the allegations that Appellee Duke
> collected money through its use of the mails and funneled the money to
> DERS and thereafter back to favored customers in a fraudulent scheme, we
> find that Plaintiffs have set out a cognizable claim of money laundering
> based upon the unlawful activity of mail fraud.

681 F.3d at 803. The Sixth Circuit also recognized obstruction of justice as an additional

viable predicate for plaintiffs' Ohio Corrupt Practices Act claim:

> The selective payment of rebates constitutes a felony under Ohio law. See
> Ohio Rev. Code §§ 4905.32-.33(A), 4905.56, 4905.99. Thus, communicating
> false information to any person for the purpose of hindering the discovery of
> the selective payment of rebates would constitute obstruction of justice . . . .
> [C]orporate counsel are not permitted to freely make false statements before
> a court and evade charges of obstruction of justice.

681 F.3d at 804. Further, the Sixth Circuit held that plaintiffs' allegation that Duke's mail-

ings to plaintiffs and other customers that the electric charges were "mandatory and un-

avoidable" fraudulently concealing the rebates to the favored customers was sufficient to

plead the predicate acts to the civil RICO and Ohio Corrupt Practices Act claims:

> As Plaintiffs have pled, Duke's fraud was in asserting through the mail that
> all customers had to pay "mandatory and unavoidable" electricity charges,
> implying that all customers paid the same rate (which they were required to
> do under the RPA). Thus, Plaintiffs allege that Duke's non-disclosure of the
> side agreements constitutes fraud.

---

[44]681 F.3d at 802-804

681 F.3d at 802. The Court of Appeals concluded that plaintiffs had pleaded fraud with sufficient particularity to satisfy Rule 9(b), Fed. R. Civ. P. *Id.*, at 803. Moreover, the Sixth Circuit held:

> taking as true the allegations that Appellee Duke collected money through its use of the mails and funneled the money to DERS and thereafter back to favored customers in a fraudulent scheme, we find that Plaintiffs have set out a cognizable claim of money laundering based upon the unlawful activity of mail fraud.

*Id.*

Plaintiffs further argue that there is a prima facie case of obstruction of justice based on Duke lawyer Paul Colbert's denying knowing of any side agreements even though he signed side agreements with the Ohio Hospital Association on behalf of its hospitals. Communicating false information to any person for the purpose of hindering the discovery of the selective payment of rebates would constitute obstruction of justice.

**Defendants' arguments.**

Defendants argue that plaintiffs make no effort to tie the documents they seek to the crimes and frauds they allege in their complaint. Instead, citing *Skeddle*, 989 F. Supp. at 900 and *In re Miller*, 247 B.R. 704, 712 (Bankr. N.D. Ohio 2000, they assert that the court should exercise its discretion to review the documents *in camera* to evaluate whether the second prong of the test has been met. Defendants maintain that this argument should be rejected because the court has already held that "[c]ourts should not routinely conduct in camera reviews of documents[,]" as such reviews "undermine the privilege and are both

burdensome for judges and unnecessarily invasive of litigants' privacy.[45] Instead, the Court directed Plaintiffs to file a motion to compel and make the necessary showing to defeat Duke's privilege assertions.[46] The Order further stated that plaintiffs needed to "make a factual showing adequate to support a good faith belief that the in camera review [would] reveal evidence that would establish that the crime-fraud exception applies."[47]

Defendants further argue that plaintiffs have made no attempt to make the showing required by the November 12, 2013 Order. That Order said that *Zolin*'s warning that "[t]here is no reason to permit opponents of the privilege to engage in groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents."[48] Defendants maintain that given plaintiffs' failure to demonstrate a *prima facie* case for any crime or fraud---or to show a 'close relationship' between the communications and the client's [alleged] illegal activities"-this Court should decline their request for in camera review.

Defendants argue that plaintiffs have not come forward with evidence of any crime or fraud. Although the Sixth Circuit may have said that "[t]he selective payment of rebates constitutes a felony under Ohio law,"[49] the court did not hold that Duke had in fact paid

---

[45] November 12, 2013 Discovery Dispute Conference Order, p. 3, Doc. 170, PageID 3383 (citing *United States v. Zolin*, 491 U.S. 554, 571 (1989)).

[46]*Id.*, p. 3, PageID 3385.

[47]*Id.*, p. 2, PageID 3384.

[48]*Zolin*, 491 U.S. at 571.

[49] *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 804 (6th Cir. 2012).

improper rebates, violated the law, or, as plaintiffs suggest, committed a felony. Defendants assert that all the Sixth Circuit did was recite what Ohio law provides.

Moreover, defendants argue that the Ohio Revised Code sections that prohibit the selective payment of rebates apply only when the utility is providing "a like and contemporaneous service under substantially the same circumstances and conditions."[50] The Supreme Court of Ohio has repeatedly interpreted these provisions as not prohibiting rate discrimination *per se*."[51] [T]he statutes and case law do not require absolute uniformity in rates and prices; they allow utilities to charge different and unequal rates so long as there is some measurable difference in the furnishing of services."[52] Rather, defendants maintain, the statutes prohibit "charging different rates when the utility is performing 'a like and contemporaneous service under substantially the same circumstances and conditions."[53]

The U.S. Supreme Court made clear in *Clark* that "this conception of the privilege"--that "a mere charge of illegality, not supported by any evidence, will set the confidences free"--is "'absurd.'"[54] Defendants argue that the only proof plaintiffs offer for the central allegation in their complaint can be summarized as follows:

- While being deposed, a lawyer for the Ohio Hospital Association, Rick

---

[50] See Ohio Rev. Code Ann.§ 4905.33(A)

[51]*See, e.g., AK Steel Corp. v. PUCO*, 95 Ohio State 3d 81, 86-87 (Ohio S.Ct. 2002).

[52]*DiFranco v. FirstEnergy Corp.*, 134 Ohio State 3d 144, 153 (Ohio S.Ct. 2012).

[53]*AK Steel Corp.*, 95 Ohio State 3d at 86-87.

[54]Clark, 289 U.S. at 15 (citations omitted).

19

Sites, referred to the option payments as a rebate.[55]

- In an unauthenticated email purportedly produced in discovery, some-body named Rich Hertlein, at an organization that plaintiffs assert (without evidentiary support) is a member of the Ohio Hospital Association, referred to the option payment as a "rebate".[56]

- In an undated, untitled, redacted, and unauthenticated document purportedly produced in discovery, an unknown person, purportedly an agent or employee of General Electric Aircraft Engines, referred to something otherwise unidentified as a "CG&E Rebate".[57]

- In a documents defendants produced in discovery there is one-page breaking out the components of the "CRS Option Payment for First Quarter 2006" for Christ Hospital that bears the heading "Electric Rebate".[58]

Defendant argues that the use of the word "rebate" in a handful of documents is a far cry from a *prima facie* showing that a serious crime or fraud occurred or that attorney-client communications were used to facilitate any crime or fraud.

As to the obstruction of justice claim, defendants assert that plaintiffs presented only two pieces of supporting evidence:

- During an April 25, 2006 oral argument before the Supreme Court of Ohio, Duke lawyer Paul Colbert denied knowing of any side agreements.[59]

- In the *Deeds* case and this case, Duke has strained to characterize the

---

[55]Plaintiffs' January 10, 2014 Motion to Compel, p. 11, PageID 3564 (citing doc. 159-2, at 130 and 186-87).

[56]*Id.* (citing doc. 159-4)("It is also my understanding that the CG&E bills will continue to be sent to the same addresses as they are now, and that the CRES quarterly rebate check will be sent to me, as addressed above. Thanks, Rich Hertlein").

[57]*Id.*, pp. 11-12, PageID 3564-65 (citing doc. 159-5).

[58]*Id.*, p. 12, PageID 3565 (citing doc. 159-6).

[59]*Id.*, p. 9, PageID 3562 (citing doc. 57, p. 4 (Statement by Colbert: "[I]t is unknown whether there were any [side agreements] in this case."

"option payments" as something other than rebates and the agreements providing for them as legitimate business transactions rather than kickbacks.[60]

Defendants assert that plaintiffs misrepresent attorney Paul Colbert's statements to the

Supreme Court of Ohio.

During oral argument, Mr. Colbert stated:

I would like to point out that, indeed, there's no effect of any alleged side deals - and of course, because there was no discovery, uh, it is unknown whether there were any in this particular case- but the ... there's no effect on customers, whether we had side deals with those customers or not. The same market prices, approved by the Commission, have to be in place for all of the customers.[61]

Duke argues that Colbert did not "blatant[ly] lie to the Supreme Court of Ohio" or "den[y]

knowing of any side agreements"[62]; he simply offered a parenthetical comment that the

existence of such side agreements was not in the record, which was an absolutely true

statement.

Rick Sites testified at deposition: "Well--as I understand what Paul Colbert said--he

put it in the context of the lack of discovery. So to the extent his answer to that was based

on the fact that nothing had been discovered in the case for which he was making oral

argument, it wouldn't be untrue."[63]

---

[60]*Id*. at 9-10, PageID 3562-63

[61]See *Ohio Consumer's Counsel v. Public Utils. Comm 'n of Ohio*, Case No. 2005-0946, Oral Argument (Apr. 25, 2006) (available at http://www.ohiochannel.org/MediaLibrary /Media.aspx?fileId=119568).

[62]Plaintiffs' January 10, 2014 Motion to Compel, p. 9, doc. 175, PageID 3562.

[63]Sites Dep. pp. 184-85, Doc. 159-2, PageID 3058-59.)

As to the argument that Duke has strained to characterize the payments as legit-
imate business transactions, defendants maintain that plaintiffs have produced no
evidence that the option payments were not legitimate business transactions.

Defendants argue that The Sixth Circuit employs an eight-factor test:

> (1) Where legal advice of any kind is sought (2) from a professional legal
> adviser in his capacity as such, (3) the communications relating to that
> purpose, ( 4) made in confidence ( 5) by the client, ( 6) are at his instance
> permanently protected (7) from disclosure by himself or by the legal
> adviser, (8) unless the protection is waived.

*Reed v. Baxter*, 134 F.3d 351,355-56 (6th Cir. 1998) (citing *Fausek v. White*, 965 F.2d 126, 129
(6th Cir. 1992).

**Defendants' February 18, 2014 motion to strike (doc. 180).** Defendants move to
strike the affidavits of Jonathan W. Marshall[64] and Kent Marcum[65] that were attached to
plaintiffs' February 14, 2014 reply brief (doc. 179) in support of their motion to compel.
Defendants argue that the affidavits were submitted in violation of S.D. Ohio Civ. Rule
7.2(d), which provides, in relevant part:

> . . . all evidence then available shall be discussed in, and submitted no later
> than, the primary memorandum of the party relying upon such evidence.
> Evidence used to support a reply memorandum shall be limited to that
> needed to rebut the positions argued in memoranda in opposition.

Defendants argue that the affidavits could easily have been submitted with the motion to
compel. Further, defendants argue that neither affidavit contains admissible evidence.
Plaintiffs contend that the affidavits address arguments made by defendants in their

---

[64]Doc. 179-5, PageID 3765-67.

[65]Doc. 179-6, PageID 3769-70.

memorandum in opposition to the motion to compel.

The arguments the affidavits support were made by plaintiffs in their initial brief supporting their motion to compel and countered by arguments in defendants' memor-andum contra. Defendants did cite testimony and evidence to support their arguments, but these arguments did not raise new issues. Plaintiffs should have offered all the evid-ence supporting their arguments in their initial brief. Further, the affidavits state opinions about legal principles. They are not evidence, and the legal arguments they make are better made by briefs.

For these reasons, defendants' February 18, 2014 motion to strike (doc. 180) is GRANTED.

**Crime-fraud exception: Decision.**

Plaintiffs have failed to offer evidence that defendants sought the advice of counsel with the intention of committing a crime or a fraud. Assuming, without deciding, that plaintiffs may ultimately be able to prove the fraud/crime claims the Sixth Circuit held are actionable–a fact that is not established by the Court of Appeals' decision and for which plaintiffs offer no evidence in support of their motion to compel–plaintiffs have offered no evidence that the purpose of the communications between defendants' business employ-ees and their in-house counsel was to facilitate the commission of a crime or a fraud.

When deciding what course of business action to take, a company is not governed by considerations of fairness or morality. Justice Holmes' "bad man" theory of the law posits that clients consult their lawyers to obtain a prediction "of what the courts will do

in fact . . . ."[66] Here it appears that defendants consulted with their in-house lawyers about the legal consequences of the options agreements they ultimately entered with the large electricity users who opposed CG&E's January 26, 2004 proposed RSP. Assuming, as plaintiffs assert, that CG&E's lawyers advised them to enter those agreements, their supposed prediction that those agreements did not violate the law[67] would not amount to a crime or fraud that destroys the attorney-client privilege.

There is a difference between going to a lawyer and asking the lawyer to tell you whether the course of action you want to pursue is arguably within the limits of what the law permits and going to a lawyer and asking the lawyer to assist you in violating the law or to show you how to violate the law. Here plaintiffs have offered no evidence, direct or circumstantial, that suggests defendants took the latter course when they consulted with in-house counsel about the options agreements.

Plaintiffs also argue that Paul Colbert committed a crime or a fraud by telling the Supreme Court of Ohio during an April 25, 2006 oral argument that there were no side agreements. Whether that is so or not depends on facts already known to plaintiffs. There is a recording of the oral argument, and plaintiffs have taken discovery about the agreements with the large electricity customers. They have those agreements and the testimony of those involved in creating and executing them.

Further, plaintiffs have offered no facts demonstrating, or even suggesting, that the

---

[66] Holmes, "The Path of the Law", 10 Harv. L. Rev. 457, 460-61 (1897).

[67] Plaintiffs have not proffered a scintilla of evidence that CG&E's lawyers advised defendants that the agreements were illegal.

email communications at issue in this discovery dispute would in any way provide further, non-cumulative support for their argument that Colbert committed a fraud on the Supreme Court of Ohio.

To the extent that plaintiffs may be arguing that defendants must have committed a crime or fraud because Colbert's lack of frankness in his response to a question during oral argument suggests Duke had something to hide, the inference is too slender and built on supposition rather than fact. The options agreements were not of record in the PUCO proceedings. Colbert did not assert that there were no side agreements. He did argue that if there were, they would have no impact because "[t]he same market prices, approved by the Commission, have to be in place for all of the customers." That statement could be viewed as misleading, although an experienced judge would not likely be mislead. And, in fact, the Supreme Court of Ohio's decision remanded with directions that Duke had to produce the side agreements.[68]

In short, plaintiffs have not met their burden of making a factual showing adequate to support a good faith belief that an *in camera* review would reveal evidence that would establish the crime-fraud exception.

## IV. Attorney-client privilege: Background to documents

In 1999, the Ohio General Assembly passed Amended Substitute Senate Bill No.3 ("S.B. 3"). It gave consumers the ability to select their electric generation service provid-

---

[68] *Ohio Consumers' Counsel v. PUCO*, 111 Ohio State 3d 300, 319-20 (Ohio S.Ct. 2006).

ers.[69] S.B. 3 also established a "market development period," from 2001 to 2005, during which electric utilities' rates were frozen.[70] Once the market development period ended, PUCO's authority to set electricity rates was to end.

On January 10, 2003, CG&E filed its Market Based Standard Service Plan ("MBSSO") application asking PUCO to establish market-based rates for non-residential end-use customers after the market development period.[71] The Commission, concerned that an immediate shift to market-based rates would not be in customers' best interests, invited CG&E to file a "rate stabilization plan" ("RSP") in lieu of the MBSSO, which it did on January 26, 2004.[72]

Certain parties had objected to CG&E's original application but agreed to move away from CG&E as their electricity supplier to Cinergy Retail Sales, LLC ("CRS"), a PUCO-certified Competitive Retail Electric Service ("CRES") provider and CG&E affiliate.[73] As part of that agreement, those parties agreed not pursue their objections to CG&E's application. On May 19, 2004, CG&E filed a stipulation co-signed by the Com-

---

[69] Ohio Rev. Code Ann.§ 4928.02.

[70] Ohio Rev. Code Ann.§§ 4928.35 and 4928.40.

[71] *In the Matter of the Application of the Cincinnati Gas & Elec. Co. to Modify its Non-Residential Generation Rates to Provide for Market-Based Standard Serv. Offer Pricing and to Establish a Pilot Alternative Competitively-Bid Serv. Rate Option Subsequent to Market Dev. Period*, PUCO Case No. 03-93-EL-ATA ("In re CG&E RSP"), Summary of Application, at 1 (Jan. 10, 2003); Johnson Decl., ¶ 11, Doc. 175-2, PageID 3635.

[72] See *In re CG&E RSP, CG&E's Filing in Response to the Req. of the PUCO to File a Rate Stabilization Plan*, at 4 (Jan. 26, 2004); Johnson Decl., ¶ 13.

[73] In fact, CG&E never asked PUCO to certify CRS as a CRES provider.

mission's staff and ten other organizations, including some of the objectors, which recommended that the PUCO adopt an RSP with specified customer charges, cost recovery "riders," and cost "trackers."[74] During hearings the next day, the Ohio Consumers' Counsel ("OCC") moved to compel CG&E to produce alleged "side agreements" that the OCC claimed related to the stipulation.[75]

The hearing examiner denied the motion.[76] On September 29, 2004, PUCO approved the stipulation, but with modifications.[77] On November 23, 2004, after several other parties filed applications for rehearing, PUCO issued a new entry adopting in part an alternative rate proposal proposed by CG&E.[78] Because the stipulation was modified by PUCO, first in September and subsequently in December, 2004, the agreements with CRS, by their terms, became void. Nonetheless, CRS agreed to enter into separate "option agreements" with the same parties that called for those parties to switch to CRS if the market fell to a certain competitive price level, in return for option payments.[79]

In March 2005, the OCC appealed to the Supreme Court of Ohio. Oral argument was held on April 26, 2006. On November 22, 2006, the Court issued an opinion affirming

---

[74]*In re CG&E RSP, Stipulation and Recommendation* (May 19, 2004).

[75]*Ohio Consumers' Counsel v. PUCO*, 111 Ohio State 3d 300, 301, 319 (Ohio S.Ct. 2006).

[76]*Id.*

[77] *In re CG&E RSP, Op. and Order* (Sept. 29, 2004).

[78]*In re CG&E RSP, Entry on Reh'g* (Nov. 23, 2004).

[79] See Second Am.Compl. at ¶¶19-20; see also Pls.' Mot. to Compel at 2.

in part and reversing in part PUCO's decision. While it rejected most of the OCC's arguments, the Court held that the Commission could not rely on the stipulation without determining whether it was the product of "serious bargaining." Holding that any "side agreements" could be relevant to this issue, the Supreme Court remanded with instructions to allow discovery of the requested information.[80] After the Supreme Court's remand, the OCC broadened its discovery requests to include the option agreements.[81] On January 2, 2007, the hearing examiner ordered that the agreements be produced.[82]

On October 24, 2007, PUCO issued an order rejecting the May 2004 stipulation in its entirety and reconsidering CG&E's original RSP application.[83] Concluding that the agreements signed after the Commission's November 23, 2004 Entry on Rehearing (which included the option agreements) were "irrelevant to [the] proceeding,"[84] PUCO approved, with some modifications, CG&E's original RSP.[85] These orders were the subject of the OCC's second appeal to the Supreme Court of Ohio. The Supreme Court affirmed, upholding PUCO's rulings on the side agreements and dismissing the appeal of the RSP rates as moot because the RSP had expired and been replaced with a new rate structure approv-

---

[80] *Ohio Consumers' Counsel*, 111 Ohio State 3d at 319-20.

[81] *Ohio Consumers' Counsel v. Pub. Utils. Comm 'n*, 121 Ohio State 3d 362, 363 (Ohio S.Ct. 2009).

[82]*In re CG&E RSP*, Entry, ¶¶ 4 and 11 (Jan. 2, 2007).

[83]*In re CG&E RSP, Order on Remand*, at 28 (Oct. 24, 2007).

[84]*Id*. at 26.

[85] See *In re CG&E RSP, Entry on Reh'g* (Dec. 19, 2007).

ed by PUCO.[86].

**The *Deeds* Case.**

In December 2006, a former Duke employee named John Deeds filed a whistle-blower action in the United States District Court for the Southern District of Ohio against Duke Energy Corporation and Duke Energy Retail Sales, LLC.[87] Deeds was represented by, among other attorneys, plaintiffs' counsel Randolph H. Freking. The federal action was dismissed for lack of subject matter jurisdiction, and Deeds re-filed in the Court of Common Pleas for Hamilton County, Ohio.[88] In the state *Deeds* action, Deeds accused Duke of "threatening, firing, and harassing [him for] refus[ing] to go along with and then reveal-[ing]" the option agreements.[89] That action was settled.[90]

## V. Attorney-client privilege: Decision

**Defendants' claims of privilege and work product protection.** Ariane S. Johnson, Associate General Counsel, Duke Energy Business Services, Inc., reviewed the documents withheld as privileged or entitled to work product protection and grouped them into 13

---

[86]*See generally Ohio Consumers' Counsel*, 121 Ohio State 3d at 365-66.

[87] *Deeds v. Duke Energy Corp.*, Case No. 1:06-cv-00835; Johnson Decl., ¶ 23, Doc. 175-2, PageID 3637.

[88]*Deeds v. Duke Energy*, Case No. A 0701671.

[89]Plaintiffs' August 14, 2006 Memorandum in Opposition to Defendants' Motion to Dismiss, p. 41, Doc. 47, PageID 690.

[90] See Hamilton County Clerk of Courts, Case Summary, http://www.courtclerk. org/case summary.asp?sec=history &casenumber=A0701671.

categories. This decision will discuss the withheld documents by reference to the categor-

ies in Ms. Johnson's December 17, 2013 declaration. Following the description of each cate-

gory, a document number for each document withheld in that category and a description

of each document are set out.[91]

**Category A:**     **[A] series of emails among counsel, copying clients such as Gainer, Ficke, and Steffen. In the emails, the lawyers discuss the legal implications of undertaking certain steps following a decision by the PUCO. These communications also focus on the legal issues that might arise as a matter of contract law under certain scenarios.[92]**

Defendants' claim of privilege:   Internal discussion among lawyers (cc'ing clients) strategizing about decisions following rulings by PUCO in the RSP case; attorney work product, containing legal analysis and mental impressions.[93]

Documents[94] (14 emails sent on December 6 and 7, 2004):

- Email numbers[95] 1-6, 356-60, and 369 sent December 7, 2004, Re: new plan- confidential, (among 10 lawyers and non-lawyers)
- 394-December 6, 2007 email from CG&E's Vice President for Regulatory and Legislative Strategy James Gainer to CG&E employees Timothy Duff, Jim Ziolkoski, and John Finnigan and in-house lawyer Paul Colbert (Colbert is the only lawyer)

---

[91]The categories and the general description of the documents contained in each category are taken from Ariane S. Johnson's December 17, 2013 Declaration, pp. 9-12, ¶¶ 30-31, Doc. 176-2, PageID 3638-40. The document numbers are set out in Ms. Johnson's Declaration and are taken from defendants' privilege log. Doc. 175-1, PageID 3592-3627.

[92]Johnson Decl., ¶ 31, PageID 3639.

[93]*Id.*, ¶ 30, Table, PageID 3638.

[94]Following a bullet for each document/set of documents is the document number, date, sender, recipient(s), and subject line.

[95]The withheld email numbers are the document numbers in the left-most column of defendant's privilege log. Doc. 175-1, PageID 3592-3628.

- 395–December 6, 2004 email from Paul Colbert to in-house lawyer
  Kate Moriarty and James Gainer, Timothy Duff, and Jim Ziolkowski
  New plan -confidential," 12-6-2004 & 12-7-2004 (among 10 lawyers
  and non-lawyers)

Background facts related to these emails. On November 23,2004, PUCO issued and

Entry on Rehearing modifying CG&E's Rate Stabilization Plan. The first December 6, 2004

email (No. 394) was sent by James Gainer,[96] CG&E's Vice President for Regulatory and

Legislative Strategy, to Jim Ziolkowski, an analyst in the Rate Department,[97] CG&E em-

ployee Tim Duff, and two in-house attorneys, John Finnigan[98] and Paul Colbert. Copied on

the email were CG&E's Vice President for Rates Jack Steffen, , CG&E's President Greg

Ficke, CG&E employee Jason Barker,[99] and Kate Moriarty, an attorney who worked for

Gainer.[100] Eleven of the emails are authored by a lawyer: Finnigan (Nos. 2, 4, 357, and 369),

Colbert (Nos. 356, 358, and 395), or Moriarty (Nos. 1, 3, 6, and 360). Two emails (Nos. 5

and 359) are authored by Steffen. The privilege log describes all of these emails as "cor-

respondence regarding RSP settlement and CRES contracts."[101] Johnson states in her Dec-

---

[96]Gainer testified that he "functioned as a lawyer in [connection with the option agreements], and business people would have done that kind of analysis [who benefit-ed from the options] you're suggesting." Gainer Dep., 121, Doc. 179-2, PageID 3750.

[97]Gainer Dep., 117, Doc. 179-2, PageID 3749.

[98]Described by Gainer as "an attorney that worked for me". Gainer Dep., 117, Doc. 179-2, PageID 3749.

[99]Not identified in Johnson's declaration. Johnson Decl. ¶ 24; Doc. 175-2, ¶¶ 10 and 24, PageID 3631-32 and 3637.

[100]Gainer Dep., 117, Doc. 179-2, PageID 3749.

[101]Johnson Decl., ¶ 31, Doc. 175-2, PageID 3639.

laration: "In the emails, the lawyers discuss the legal implications of undertaking certain steps following a decision by PUCO. These communications also focus on the legal issues that might arise as a matter of contract law under certain scenarios."[102]

Plaintiffs argue that these emails were sent just prior to the execution of the side agreements that provided for illegal selective rebates.[103] They maintain that the "new plan" led to the "option agreements" through which CG&E paid illegal rebates over a period of at least four years.

To support this argument, plaintiffs first point to Jim Ziolkowski's May 11, 2006 email outlining "the history behind the so-called 'CRES' payments".[104] In late 2003, electric investor-owned utilities were still transitioning to market-based pricing. They were still in a Market Development Period that followed the January 2001 implementation of electric Customer Choice. During that period, electric rates were frozen. The Market Development Period had been scheduled to end December 31, 2005. "By 2003, the PUCO . . . became concerned that the competitive electric retail market in Ohio was not sufficiently robust to prevent wild price swings under pure competition and market pricing. . . . As a result, they asked the utilities to offer Rate Stabilization Plans in lieu of pure market pricing."[105]

In response, during the first half of 2004, CG&E filed a Rate Stabilization Plan

---

[102]*Id.*

[103]*See Williams*, 681 F.3d at 804.

[104]Doc. 179-1, PageID 3746.

[105]*Id.*

("RSP"). A number of large customers, represented by industry groups, intervened. CG&E's goal was to obtain rapid approval of the RSP. "The interveners represented a roadblock, however. To eliminate this roadblock and prevent a formal hearing, CG&E negotiated special conditions with the interveners and ultimately reached agreements with them."[106]

The original agreement with the interveners provided that Cinergy would form a Certified Retail Electric Supplier ("CRES")[107] that would supply electricity at contractually agreed rates. But "at the last minute", December 2004, "Cinergy's top management decided that the CRES settlement was too risky, and Cinergy essentially decided to not follow through with the contract. To prevent lawsuits for breach of contract, Cinergy entered into negotiations with each of the parties and agreed to make monthly or quarterly payments in lieu of offering generation service from the CRES."[108] These contracts with the industry groups generally provided that "the customers belonging to [a] group [would] receive refunds of various RSP riders."[109] Ziolkowski prepared statements showing the amounts to be refunded to each customer, then Cinergy paid those amounts to the customers out of

---

[106]*Id.*

[107]Paul Colbert testified that in Ohio "a CRES is a certified supplier of competitive retail electric services, where the certification is made by the Public Utilities Commission upon application by the supplier. And they're authorized to provide limited and very specific types of--of services, primarily the sale of generation."

[108]*Id.*

[109]*Id.*

"the CBU's[110] (non-regulated generation) budget."[111] The payments were to continue through December 2008. They totaled about $22,000,000 a year because they included "some of the largest retail customers in the service territory: AK Steel, Procter & Gamble, General Electric, Ford, Ashland/Marathon, all of the hospitals, and others."[112]

Next plaintiffs point to James Gainer's deposition. In December 2004, he was CG&E's Vice President for Regulatory and Legislative Strategy. He testified that there were option agreements that "gave the CRES an option to serve those customers in return for a payment."[113] He did not recall the reasons for switching from the agreement negotiated in November 2004 to the option agreements.[114] He described it as a management decision that he did not know had anything to do with PUCO's order.[115] He believed the company could have kept the November 2004 agreement rather than negotiate the option agreements.[116] Gainer further testified that he consulted with Rogers (the ultimate decision-maker), Ficke, Steffen, Manly, and Cyrus about the Option Agreements.[117] One

---

[110]Gainer testified that the Commercial Business Unit was responsible for calculating the value of the option agreements to Cinergy. Gainer Dep., 120, Doc. 179-2, PageID 3749.

[111]*Id.*

[112]*Id.*

[113]Gainer Dep., 118, Doc. 179-2, PageID 3749.

[114]*Id.*, 118-19.

[115]*Id.*, 119.

[116]*Id.*, 126, PageID 3751.

[117]*Id.*, 119-20, PageID 3749.

purpose of the option agreements may have been to fulfill the commitment Cinergy made in May and November 2004 to the interveners opposing Cinergy's RSP pending before PUCO.[118] Gainer acknowledged that CG&E had an agreement with the 22 large customers "to negotiate in good faith to try to put the parties back in the same economic position."[119] However, Gainer insisted that the decision to negotiate option agreements was a management decision, and his participation in that process was as a lawyer, albeit one whose office was Cinergy's Vice President of Legislative and Regulatory matters with direct supervisory authority over the Rate Department.[120]

Paul Colbert testified in his deposition in the *Deeds* case[121] that there were no contracts that Cinergy Retail Services ("CRS") had that had been termed a settlement agreement.[122] Cinergy never formed a CRES in connection with its RSP.[123] However, he further testified that all the interveners supported their May 2004 "settlement [with Cinergy], which resolved the RSP."[124]

Colbert further testified that negotiation of the options agreements began in Dec-

---

[118]*Id.*, 121-23, PageID 3750.

[119]*Id.*, 126, PageID 3751.

[120]*Id.*, 124-25.

[121]*John Deeds v. Duke Energy/Duke Energy, Ohio Inc., et al.*, Case No. A0701671 (Hamilton Cty.C.P.Ct. February 8, 2008).

[122]Colbert Dep., 65, Doc. 179-3, PageID 3755.

[123]*Id.*, 95, PageID 3757.

[124]*Id.*, 116, PageID 3760.

ember 2004 after PUCO's final order in the RSP case.[125] The options agreements were negotiated with customers who intervened in the RSP case or were members of an association that intervened in that case.[126]

Plaintiffs assert that defendants' argument that the option agreements related to PUCO's order in the RSP case and to CG&E's legal strategy for dealing with it runs counter to Gainer's testimony: "You know, I think it was a management decision. I don't know it had anything to do with the Commission's order."[127] Plaintiff argues that these facts demonstrate that what occurred in December 2004 related to a business decision rather than to any legal strategy in the RSP case, in which PUCO issued its final order in November. Consequently, plaintiff contends that defendants have failed to prove that the December 6 and 7 emails were attorney-client communications.

While plaintiffs correctly assert that the decision about of how to implement their agreement with the large electricity users who objected to CG&E's January 26, 2004 proposed RSP is a business decision, that does not shed any light on the question of whether these emails were attorney-client communications. When making business decisions, companies frequently consult with their in-house lawyers about the legal implications of the options they are considering. Here CG&E had an agreement and it was considering whether to modify it. One important purpose in entering contracts is to insure that if they

---

[125]*Id.*, 110, PageID 3759.

[126]*Id.*, 113-14, PageID 3759-60.

[127]*Id.*, 119, PageID 3749.

are breached there is a remedy at law. Consequently, it is prudent to consult your lawyer before modifying or entering a contract.

Turning to the question of whether defendants have offered facts sufficient to demonstrate that the emails were  attorney-client communications, Johnson's assertion in her declaration is that the Category A emails are " a series of emails among counsel" that "discuss the legal implications of undertaking certain steps following a decision by the PUCO" and "the legal issues that might arise as a matter of contract law under certain scenarios."[128]  These "facts" are too skeletal for me to determine whether these emails were attorney-client communications. First, the emails do not appear to be a "series of emails among counsel . . . ." The first email in the series was sent by CG&E's Vice President for Regulatory and Legislative Strategy James Gainer to an analyst in the Rate Department, another employee and two in-house counsel. Two other emails were authored by CG&E's Vice President for Rates Jack Steffen. Even the eleven emails authored by a lawyer were sent to as many non-lawyers as lawyers. Second, the subject matter of the emails is insufficiently described to determine whether these emails sought/contained legal advice. The PUCO decision about which advice was allegedly sought is not identified, nor is the nature of the advice sought. What contract(s) the emails might relate to is not identified. Defendants have done little more than to invoke the words " attorney-client privilege" without offering any supporting facts.

It is ORDERED that on or before **August 22, 2014** defendants provide an affidavit

---

[128]Johnson Decl., ¶ 31, PageID 3639.

from James Gainer, Jack Steffan, Jim Ziolkowski, John Finnigan, and Paul Colbert stating

the factual predicates for the claims of attorney-client privilege, including who sought

legal advice, which PUCO decision(s) are discussed in the emails, whether the discussions

were about the business and/or legal implications of the ruling(s), the purpose(s) of the

emails authored by non-lawyers, and whether the contract issues related to the large

customers/industry groups CS&G entered contracts with after they intervened in the

PUCO proposed RSP proceeding and/or the contracts entered with those customers in or

after December 2004. Alternatively, defendants may submit those emails for *in camera*

review.

**Category B:   Items 10-11 are an internal discussion between attorneys and clients
               regarding settlement proposals in the MBSSO case in 2007.**

Defendants' Claim of Privilege:  Internal discussions about settlement strategy in
                                  MBSSO case, which occurred in 2007, after the RSP.
Documents:
  • 10–May 4, 2007 email from in-house lawyer Paul Colbert to David
    Celona,[129] Amended MBSSO settlement proposal for parties
  • 11–May 21, 2007 email from  Colbert to Caldwell, Sandra Meyer,
    Celona, Smith, Barry W. Wood,[130] 5-21-07, Amended MBSSO
    settlement

Plaintiffs do not discuss Category B in either their motion to compel or their reply

brief. Johnson's December 17, 2013 Declaration states that the emails "are internal dis-

cussions between attorneys and clients regarding settlement proposals in the MBSSO case

---

[129]Not identified in the Johnson Declaration. Johnson Decl. ¶ 24; Doc. 175-2, ¶¶ 10
and 24, PageID 3631-32 and 3637.

[130]Not identified in the Johnson Declaration.

in 2007."[131] The privilege log identifies the two May 2007 emails as "communications containing confidential A/C communications and attorney work product regarding settlement of RSP case."[132] The May 14, 2007 email was from in-house lawyer Paul Colbert to David Celona, a Duke employee whose job duties are not identified in the Johnson Declaration.[133] The May 21, 2007 email was sent by Colbert to Myron Caldwell, apparently a Duke employee although his job duties are not identified, Sandra P. Meyer, who became president of Duke Energy Ohio after CS&G's merger with Duke in 2006, David Celona, Paul Smith, who following the merger was Vice President of Rates in Ohio, and Barry W. Wood, Jr., whose position also was not identified by defendants.

Defendants have offered sufficient evidence to support their claim of  attorney-client privilege, and plaintiffs have offered no evidence that a purpose of the attorney-client communications was to assist the client in committing a crime or a fraud.

**Category C:   [C]ommunications between clients and their attorney(s) in which settlement proposals relating to RSP settlement are discussed internally only; that is, none of these communications are with outside parties. These communications contain drafts for attorney review and comment in connection with a meeting in which settlement proposals are to be discussed. The drafts are also prepared at the request of counsel and constitute work product.[134]**

Defendants' Claim of Privilege:  Client seeking advice of counsel and communica-
                                  tion with other clients re RSP settlement, including

_____

[131]Johnson Decl., ¶ 31, PageID 3639.

[132]Doc. 175-1, PageID 3592.

[133]*Id*.; Johnson Decl. ¶ 24; Doc. 175-2, ¶¶ 10 and 24, PageID 3631-32 and 3637.

[134]*Id*., ¶ 31, PageID 3639.

with Kroger.[135]

Documents:

- 40--January 13, 2006 email from in-house lawyer Michael Pahutski[136] to in-house lawyer Paul Colbert, Kroger, Constellation, New Energy[137]
- 51–September 16, 2014 email from Norma Bales,[138] Updated: RSP Option pre-order issuance meeting[139]
- 52–September 21, 2014 email from Vice President Regulatory and Legislative Strategy James Gainer to Michael Cyrus,[140] CG&E President Greg Ficke,[141] Vice President for Rates Jack Steffen,[142] in-house lawyer Paul Colbert, and Jim Turner,[143]  RSP options.doc[144] (of addressees, only Colbert is an attorney)
- 53–September 15, 2014 email from James Gainer to Steve Schrader,[145] CG&E President Greg Ficke, Vice President for Rates Jack Steffen, Paul Colbert, Michael Cyrus,[146] RSP options.eml[147] (of addressees, only Colbert is an attorney)
- 54–Apparently undated email from Gainer to Schrader, Ficke,

---

[135]*Id.*, ¶ 30, Table, PageID 3638.

[136]Michael Phutski was a Duke in-house lawyer. His job title was Senior Counsel. He later became Associate General Counsel. Johnson Decl. ¶ 10, Table, PageID 3634.

[137]Doc. 175-1, PageID 3595.

[138]Ms. Bales was an executive administrative assistant. *Id.*, PageID 3635.

[139]Doc. 175-1, PageID 3596.

[140]Not identified in the Johnson Declaration.

[141]Greg Ficke was President of CG&E. *Id.*, ¶ 17, PageID 3636.

[142]*Id.*, ¶ 17, PageID 3636

[143]Not identified in the Johnson Declaration.

[144]Doc. 175-1, PageID 3596.

[145]Not identified in the Johnson Declaration.

[146]Not identified in the Johnson Declaration.

[147]Doc. 175-1, PageID 3596.

Steffen, Colbert, and Cyrus, ERRSP Settlement Summary.doc[148]

- 55–September 30, 2004 email from Gainer to Ficke, Steffen, Bales, Colbert, Meeting with Boehm and Kurtz[149]
- 56–November 30, 2004 email from Suzanee Kesling[150] to Colbert, Dan Jones,[151] Michael McClaine,[152] Karen Wallace,[153] Leigh Pefley,[154] Ficke, Tiffany Moore,[155] and Suzanne Kesling,[156] Special Contracts (Previous Choice Agreements and New ERRSP Agreements)[157] (of addressees, only Colbert is an attorney)
- 57–December 8, 2004 email from Gainer to Ficke, Steffen, Tim Duff,[158] Colbert, Moriarty, and Gainer, Updated Meeting with Boehm and Kurtz[159]
- 121–July 9, 2007 email from Duke in-house lawyer Rocco D' Ascenzo[160] to Duke Vice President for Rates in Ohio Paul Smith, Re: Contract Customers[161]
- 152–October 14, 2005 email from Gainer to Jim Turner[162] and Chief

---

[148]*Id*.

[149]*Id*.

[150]Not identified in the Johnson Declaration.

[151]Not identified in the Johnson Declaration.

[152]Not identified in the Johnson Declaration.

[153]Not identified in the Johnson Declaration.

[154]Not identified in the Johnson Declaration.

[155]Not identified in the Johnson Declaration.

[156]Ms. Kesling is identified as both the sender and as a recipient of the email.

[157]Doc. 175-1, PageID 3596.

[158]Not identified in the Johnson Declaration.

[159]Doc. 175-1, PageID 3596.

[160]*Id*., ¶ 10, Table, PageID 3633.

[161]Doc. 175-1, PageID 3603.

[162]Not identified in the Johnson Declaration.

Legal Officer Marc Manly, Fw: Kroger Settlement Term Sheet(2).doc[163]

- 153–October 14, 2005 email from Steffen to Gainer, Re: Kroger Settlement Term Sheet(2).doc[164]
- 154–May 23, 2008 email from Colbert to Meyer, in-house lawyer John Finnigan,[165] Duke Vice President for Rates in Ohio Paul Smith and Barry W. Wood,[166] OEG contracts[167]
- 155–May 23, 2008 email from Smith to Colbert, Duke Ohio President Sandra Meyer, Finnigan, Barry W. Wood,[168] and MyronCaldwell,[169] OEG contracts[170]
- 182–October 14, 2005 email from Gainer to Steffen and Duff, Re: Kroger Settlement Term Sheet.doc[171]
- 194 –June 14, 2005, email from in-house lawyer Michael Pahutski to Renee Marko,[172] Constellation NewEnergy- Kroger Extension[173]
- 211–December 14, 2005 email from Moriarty to Gainer, Re: All party stipulation draft with Cincy changes 12-13-05 (HO624371).DOC[174]
- 278–January 25, 2006 email from Vice President and General Counsel

---

[163]Doc. 175-1, PageID 3606.

[164]Doc. 175-1, PageID 3606.

[165]*Id.*, ¶ 10, Table, PageID 3634

[166]Not identified in the Johnson Declaration.

[167]Doc. 175-1, PageID 3606.

[168]Not identified in the Johnson Declaration.

[169]Not identified in the Johnson Declaration.

[170]Doc. 175-1, PageID 3606.

[171]Doc. 175-1, PageID 3608.

[172]Not identified in the Johnson Declaration.

[173]Doc. 175-1, PageID 3609.

[174]Doc. 175-1, PageID 3610.

Jeff Gollomp[175] to Greg Cecil,[176] Chuck Whitlock, President of DERS (formerly CRS),[177] Ficke, Gainer, Colbert, and Pahutski, Re: Guidance needed-KROGER[178]

- 331–July 25, 2007 email from Nanmada Nanjundan[179] to Pahutski, RE: DERS Agreement[180]
- 393–September 4, 2004 email from Steffen to Barker, Gainer, Colbert and Duff, RE: CRS Rates - Draft #2 8-27-04(2).xls[181]
- 396–April 11, 2006 email from Duff to Ziolkowski, No subject indicated on privilege log.[182] (Neither party is an attorney)(No one received copies)
- 397 –April 11, 2006 email from Duff to Ziolkowski, IEU Settlement 2006.xls[183] (Neither party is an attorney)

The facts offered to support the claim that this diverse collection of emails sent from December 2004 to May 2008 are  attorney-client communications are insufficient for me to make a determination. Some of the authors of the emails are not identified. Many recipients are not identified. See, *e.g.*, Doc. 56. The subject matter descriptions are often skeletal

---

[175]*Id.*, ¶ 10, Table, PageID 3635.

[176]Not identified in the Johnson Declaration.

[177]*Id.*, ¶¶ 21 and 24, PageID 3636-37.

[178]Doc. 175-1, PageID 3616.

[179]Not identified in the Johnson Declaration.

[180]Doc. 175-1, PageID 3620.

[181]Doc. 175-1, PageID 3627.

[182]The privilege log describes the document as an "E-mail regarding IEU settlement prepared in connection with then-pending PUCO proceedings". *Id.*

[183]Doc. 175-1, PageID 3628. The privilege log describes the document as a "[s]preadsheet regarding IEU Settlement prepared in connection with then-pending PUCO proceedings". *Id.* It does not say that the spreadsheet was prepared at the direction of an attorney or for the purpose of obtaining legal advice as opposed to prepared as part of ongoing business operations.

and, ultimately, unhelpful. For example, Documents 396 and 397 are said to be emails containing communications about a settlement in connection with a PUCO proceeding, but there is no way for me to determine whether the communications are business communications or  attorney-client communications. From the information available, but for the broad assertion in Johnson's declaration that the withheld documents are  attorney-client communications, it appears more likely that these emails are business communications between Duke business employees. It is ORDERED that on or before **August 22, 2014** defendants provide an affidavit(s) from one or more of the recipients/ authors of the emails, which PUCO decision(s) are discussed in the emails, whether the discussions were about the business and/or legal implications of the ruling(s), the purpose(s) of the two emails authored by non-lawyers, whether the contract issues related to the large customers/industry groups CS&G entered contracts with after they intervened in the PUCO RSP proceeding and/or the contracts entered with those customers in or after December 2004. Alternatively, defendants may submit those emails for *in camera* review.

**Category D:  [C]lient requests for advice and counsel input into drafts of materials pertaining to PUCO proceedings.**[184]

Defendants' Claim of Privilege:  Internal discussion with clients about issues in regulatory filings having to do with RSP rehearing and/or extension of RSP in Ohio.[185]

Documents:
  • 9–October 31, 2007 email from Duke Enery Ohio President Sandra

---

[184]Johnson Decl., ¶ 31, Doc. 175-2, PageID 3639.

[185]*Id.*, ¶ 30, Table, PageID 3638.

Meyer to in-house lawyer Paul Colbert, Fw: Ohio Update[186]
- 12–May 29, 2007 email from Colbert to Duke Group Executive and President Thomas O'Connor,[187] Meyer, David Celona, and Vice President for Rates in Ohio Paul Smith, FW: OH Rate Stabilization Plan-Issue Brief[188]
- 13--May 29, 2007 email from Colbert to O'Connor, Meyer, Celona, and Smith, No subject indicated on privilege log[189]
- 38--March 5, 2007 email from Steve Brash[190] to Barry W. Wood,[191] Steffen, Smith and Colbert, Re: DERS contracts release[192]
- 325-- July 27, 2006 email from Vice President and General Counsel Jeff Gollomp to Lee Barrett,[193] Phillip Grigsby,[194] Curtis Davis,[195] Chuck Whitlock, Fred W. Wiesen,[196] and Paul H. Berry,[197] Re: RSP

---

[186]The privilege log describes this document as: "E-mail communication containing confidential A/C communications and attorney work product on rehearing of RSP case before the PUCO". Doc. 175-1, PageID 3592.

[187]Id., ¶ 19, PageID 3636.

[188]The privilege log says this document is an: "E-mail forwarding redline comments on issue brief regarding RSP settlement proposal". Doc. 175-1, PageID 3592.

[189]The privilege log says this document contains: "Redline comments on draft issue brief regarding RSP settlement proposal". Doc. 175-1, PageID 3592.

[190]Not identified in the Johnson Declaration.

[191]Not identified in the Johnson Declaration.

[192]The privilege log says this document contains: "E-mail communications containing confidential A/C communications and attorney work product regarding release of option agreements in PUCO proceedings". Doc. 175-1, PageID 3595.

[193]Not identified in the Johnson Declaration.

[194]Not identified in the Johnson Declaration.

[195]Not identified in the Johnson Declaration.

[196]Not identified in the Johnson Declaration.

[197]Not identified in the Johnson Declaration.

Update Meeting[198]

Documents 9, 12 and 13 are protected by the attorney-client privilege. The author of Doc. 38 is not identified by Johnson's declaration and only one of the four recipients is identified as a lawyer. Only one of the six recipients of Doc. 325 is identified. On or before **August 22, 2014,** defendants are ORDERED to either provide additional facts supporting the claim of attorney-client privilege as to these documents or submit them for *in camera* review.

**Category E:   This category pertains to a settlement executed prior to the RSP in which the client is seeking or counsel is providing advice regarding the requirements of the settlement. Documents that were not privileged have been produced.[199]**

Defendants' Claim of Privilege:  Attorney-Client communications regarding settlement in case prior to the RSP case (ETP case).[200]

Documents:
- 25–May 23, 2008 email from in-house lawyer Paul Colbert to Duke Ohio President Sandra Meyer, in-house lawyer John Finnigan, Vice President for Rates in Ohio Paul Smith, and Barry W. Wood,[201] OEG Contracts[202]
- 26–May 23, 2008 email from Paul Smith to Colbert, Meyer, Finnigan,

---

[198]The privilege log says this document is a"Confidential e-mail regarding meeting on RSP proceedings before PUCO". Doc. 175-1, PageID 3620.

[199]Johnson Decl., ¶ 31, Doc. 175-2, PageID 3639.

[200]*Id.*, ¶ 30, Table, PageID 3638.

[201]Not identified in the Johnson Declaration.

[202]Docs. 25-28 are described in the privilege log as "E-mail communications containing legal advice on May 8, 2000 settlement entered in PUCO transition case". Doc. 175-1, PageID 3594.

Barry W. Wood,[203] and Myron Caldwell, RE: OEG Contracts
- 27–May 23, 2008 email from Sandra Meyer to Smith, Colbert, Finnigan, Wood, and Caldwell, RE: OEG Contracts
- 28–May 23, 2008 email from Colbert to Meyer, Smith, Finnigan, Wood, and Caldwell, ORE: EG Contracts
- 156-- May 4, 2009 email from Paul Smith to Amy B. Spiller,[204] Tim Duff,[205] and Jim Ziolkowski, Option Contract Payments[206]

Johnson's declaration states that these emails are "[a]ttorney-client communications regarding settlement in case prior to the RSP case (ETP case)."[207] Defendants have made an adequate showing that these emails were attorney-client communications about a May 2008 settlement in a PUCO transition case.

**Category F: [D]ocuments prepared by counsel in connection with the RSP case. These documents were prepared for counsel's use as summary outlines of certain settlement proposals and are work product.[208]**

Defendants' Claim of Privilege:  Work Product and counsel mental impressions regarding RSP and/or RSP settlement proposals.[209]

Documents:
- 35-March 2, 2007 email from Vice President for State and Federal Regulation, Legal Kodwo Ghartley-Tague to in-house lawyers Paul Colbert, John Finnigan, and Rocco D' Ascenzo, and Paul R. New-

---

[203]Not identified in the Johnson Declaration.

[204]Although the Johnson declaration does not otherwise identify Spiller, she is listed among "Attorneys Involved" in ¶ 30, Table, PageID 3638.

[205]Merely described as one of several "other employees". *Id*., ¶ 24, PageID 3637

[206]The privilege log describes the document as a "Confidential e-mail regarding option agreements with OEG members". Doc. 175-1, PageID 3606.

[207]Johnson Decl. ¶ 30, PageID 3638.

[208]Johnson Decl., ¶ 31, PageID 3640.

[209]*Id*., ¶ 30, Table, PageID 3638.

ton,[210] Re: 5 toughest questions[211]

- 350-354–Are said to have been authored by in-house lawyer Paul Colbert in 2007.[212] There is no indication in the privilege log that they were ever distributed to anyone.
- 364-366 and 368–Are said to have been authored by in-house lawyer Paul Colbert in 2005.[213] There is no indication in the privilege log that they were ever distributed to anyone.
- 372--April 19, 2004 email from in-house lawyers Paul Colbert and John Finnigan to in-house lawyers Jim Bolin, Jeff Gollomp, Marc Manly, and Michael Pahutski and an unidentified recipient, Kay Pashos, Legal and regulatory risks related to power sales by CG&E affiliated CRES provider as part of CG&E' s proposed settlement of its ERRSP case[214]
- 373–April 16, 2004 email from in-house lawyers Paul Colbert and John Finnigan to in-house lawyers Jim Bolin, Jeff Gollomp, Marc Manly, and Michael Pahutski,  and an unidentified recipient, Kay Pashos, Legal and regulatory risks related to power sales by CG&E affiliated CRES provider as part of CG&E' s proposed settlement of

---

[210]Although Johnson's declaration does not otherwise identify Newton, he is listed among "Attorneys Involved" in ¶ 30, Table, PageID 3638.

[211]Described in the privilege log as an "E-mail communications [sic] containing confidential A/C communications and attorney work product regarding PUCO hearing". Doc. 175-1, PageID 3594.

[212]The privilege log describes these documents as an "Outline of CG&E RSP settlement proposal to" Kroger, OEG, OHA and Cognis "containing confidential A/C communications and attorney WP". Doc. 175-1, PageID 3622. Johnson describes the documents included in Category F as "Work product and counsel mental impressions regarding RSP and/or RSP settlement proposals." Johnson Decl. ¶ 30, Table, PageID 3638.

[213]The privilege log describes these documents as an "Outline of CG&E RSP settlement proposal to" IEU/Ashland Marathon, Kroger, OEG, and OHA "containing confidential A/C communications and attorney work product". Doc. 175-1, PageID 3624. Johnson describes the documents included in Category F as "Work product and counsel mental impressions regarding RSP and/or RSP settlement proposals." Johnson Decl. ¶ 30, Table, PageID 3638.

[214]The privilege log states that the document contains "[r]edline edits to memorandum addressing legal issues associated with CRES contracts and settlement with industrial customers in RSP case". Doc. 175-1, PageID 3625.

its ERRSP case[215]

- 376 –Document said to have been authored by in-house lawyer Paul ColbertMay 5, 2004, Summary of RSP settlement.[216] There is no indication in the privilege log that the document was ever distributed to anyone.
- 377- September 27, 2004 document said to have been authored by Vice President for Regulatory and Legislative Strategy James Gainer, RSP Options[217]
- 391–September 3, 2004 email from Paul Colbert to Vice President for Rates Jack Steffen and his subordinate Jim Ziolkowski,, OEG Agreement, 5-2-04[218]

As to Document 35, on or before **August 22, 2014** defendants are ORDERED to provide an affidavit from Kodwo Ghartley-Tague stating the nature of his communication and whether the communication sought advice from in-house counsel. The affidavit should set out all the facts supporting the claim of attorney-client privilege. As to Documents 350-54, 364-66, 368 and 376, on or before **August 22, 2014,** defendants are ORDERED to provide an affidavit from Paul Colbert stating the factual predicates for their assertions of the attorney-client privilege and work product protection. The affidavit should further state the distribution of the documents and indicate whether they were ever given

---

[215]The privilege log states that the email "[c]omments on memorandum addressing legal issues associated with CRES contracts and settlement with industrial customes in RSP case". Doc. 175-1, PageID 3625.

[216]The privilege log states that the document is "[p]rivileged WP". Doc. 175-1, PageID 3625.

[217]The privilege log states that this document is an "[a]ttorney memo regarding RSP litigation and settlement options". Doc. 175-1, PageID 3625.

[218]The privilege log states this is an "E-mail regarding settlement agreement with OEG in RSP case before PUCO". Attorney-client privilege and work product protection are asserted. Doc. 175-1, PageID 3627.

to persons outside the corporation. As to Document 377, on or before **August 22, 2014,**
defendants are ORDERED to provide an affidavit from James Gainer stating the factual
predicates for their assertions of the attorney-client privilege. Although Gainer was form-
erly an in-house lawyer for CG&E, he held a business position when he authored the
email. If he asserts that he was acting as an attorney when he sent the email, his affidavit
should set out the facts supporting that assertion. Alternatively as to the above docu-
ments, defendants may submit them for *in camera* inspection.

Defendants have demonstrated that Documents 372, 373, and 391 are attorney-
client and/or work product protected documents.

**Category G:** **[C]ommunications between internal counsel regarding pending proceed-
ings at the PUCO and the *Deeds* claims/litigation. In many of the items,
(for example #18-22), counsel are gathering information from each other.
In still others, counsel are discussing issues as they perceive them (#370).
In all cases, this category contains attorney work product. [219]**

Defendants' Claim of Privilege: Communication among only counsel concerning
proceedings (claims involving Deeds and proceed-
ings then pending at PUCO) and legal research on
issues; this is attorney work product.[220]

Documents:
  • 18–November 3, 2006 email from in-house lawyer Paul Colbert to
    Vice President for State and Federal Regulation, Legal Kodwo
    Ghartley-Tagoe and Associate General Counsel Ariane Johnson,
    Option Contracts[221]

---

[219]Johnson Decl., ¶ 31, PageID 3640.

[220]*Id.*, ¶ 30, Table, PageID 3638.

[221]Documents 18-22 are described in the privilege log as "E-mail correspondence
regarding option agreements and then-pending proceedings before the PUCO". Doc.
175-1, PageID 3593.

- 19–November 3, 2006 email from Johnson to Colbert, 11-3-06, Option Contracts
- 20–November 3, 2006 email from Colbert to Johnson, Option Contracts
- 21–November 3, 2006 email from in-house lawyer Michael Pahutski to Colbert, FW: MAIN3LEGAL, Side deal cases
- 22–November 3, 2006 email from senior paralegal Anita M. Schafer[222] to Colbert and Pahutski, FW: MAIN3LEGAL, Side deal cases
- 63–November 2, 2006 email from Johnson to Colbert, lEU-Ohio Agreement[223]
- 64–November 2, 2006 email from Colbert to Ghartley-Tagoe, Johnson, and Pahutski, MAIN3LEGAL, Side deal cases[224]
- 65–November 2, 2006 email from Johnson to Colbert, RE: MAIN3LEGAL, Side deal cases[225]
- 370 -March 14, 2007 email from Senior Vice President, Legal Paul Newton[226] to Rita R. Kale,[227] FW: 5 toughest questions[228]

As to Documents 18-22 and 63-65, defendants have demonstrated they are either attorney-client communications or are attorney work product. As to Doc. 370, on or before **August 22, 2014,** defendants are ORDERED to provide the affidavit(s) required earlier for

---

[222]Johnson Decl., ¶ 10, Table, PageID 3634.

[223]The privilege log says this is a "[c]onfidential e-mail communication regarding settlement with IEU prepared in connection with then-pending PUCO proceedings". Doc. 175-1, PageID 3597.

[224]The privilege log says this document is "E-mail communications discussing legal research regarding settlements in then-pending PUCO proceedings". *Id*.

[225]The privilege log says this document is "E-mail communications regarding option agreements and then-pending PUCO proceedings". *Id*.

[226]Johnson Decl., ¶ 10, Table, PageID 3633.

[227]Not identified in the Johnson Declaration.

[228]The privilege log says this is an "E-mail chain communication between Paul Newton and Marc Manly dated 3/13/2007 regarding option contracts and then-pending PUCO proceedings". Doc. 175-1, PageID 3624.

Doc. 35 and an affidavit from Kale setting out the facts supporting defendants' claim this

email was an attorney-client communication or, alternatively, submit the document for *in*

*camera* review.

**Category H:   [C]ommunications between internal counsel and support staff working under their direction and supervision regarding pending proceedings at the PUCO and the Williams matter (#114 deals with responses to requests and gathering of information in connection with the responses).[229]**

> Defendants' Claim of Privilege:   Communication among only counsel regarding this litigation (Williams case) and then pending PUCO proceedings; this includes preparation of materials for proceedings and/or discussions concerning issues/strategy; this is attorney-work product.[230]

Documents:
- 49–July 8, 2008 email from senior paralegal Anita M. Schafer to in-house lawyer Paul Colbert, FW: timeline[231]
- 70–November 28, 2006 email from Vice President for State and Federal Regulation, Legal Ghartley-Tagoe to in-house lawyers Paul Colbert and Ariane Johnson, Dortch[232] memo on side deals[233]
- 71–November 20, 2006 email from Dortch to Senior Vice President, Legal Paul Newton and Ghartley-Tagoe, SA memo (Final Draft).doc
- 72–November 22, 2006 email from Dortch to Newton and Ghartley-Tagoe, SA memo update.doc
- 114-September 13, 2007 email from in-house lawyer Rocco D' Ascen-

---

[229]Johnson Decl., ¶ 31, PageID 3640.

[230]*Id.*, ¶ 30, Table, PageID 3638.

[231]The privilege log says this is an "E-mail forwarding timeline created by counsel in connection with *Williams* litigation and PUCO proceedings" Doc. 175-1, PageID 3596.

[232]Dortch is a lawyer with Kravitz, Brown & Dortch, defendants' outside counsel. Johnson Decl., ¶ 18, PageID 3636.

[233]The privilege log says Documents 70-72 are emails "regarding Ohio Supreme Court rules on side agreements". Doc. 175-1, PageID 3598.

zo to Dortch, Attorney WP[234]

- 119–February 7, 2007 email from Sarah Welles[235] to D' Ascenzo, FW: Ziolkowski[236] e-mails[237]
- 120-Apparently an undated email from Welles to D' Ascenzo that included a file labeled Ziolkowski.pdf, Ziolkowski e-mails[238]
- 144–April 20, 2006 email from D' Ascenzo to Assistant General Counsel Kate Moriarty, RSP Side agreements[239]
- 145–April 20, 2006 email from Moriarty to D' Ascenzo, RSP Side agreements[240]
- 146–August 18, 2006 email from Peggy J. Jackson[241] to D' Ascenzo,

---

[234]Apparently the subject line of the email read: Attorney WP. The privilege log states "Confidential e-mail communication regarding options agreement sent to outside counsel". Doc. 175-1, PageID 3602.

[235]Johnson's declaration does not identify Sarah Welles. It does not include Welles as an attorney in the table setting out the nature of the privilege claimed for each category of emails and the "Attorneys Involved". Johnson Decl., ¶ 30, Table, PageID 3638.

[236]Jim Zioklowski was an analyst in defendants' Rate Department. Johnson Decl., ¶ 17, PageID 3636. Gainer Dep., 117, Doc. 179-2, PageID 3749. His May 11, 2006 email outlining "the history behind the so-called 'CRES' payments" was produced in discovery. Doc. 179-1, PageID 3746. Which emails are referenced and/or contained in Documents 119 and 120 is not stated in defendants' privilege log or in Johnson's declaration.

[237]The privilege log says this is an "E-mail forwarding information in connection with *Deeds* litigation and then-pending PUCO proceedings". The privilege asserted is "Privileged WP". Doc. 175-1, PageID 3603.

[238]The privilege log contains no description of the subject matter of the email or its purpose. The claim is made that the email was an attorney-client communication and that it contained attorney work product. *Id.*

[239]The privilege log says this is an "E-mail response to request for copies of certain PUCO orders". Doc. 175-1, PageID 3605.

[240]The privilege log says this is an "E-mail regarding request for copies of certain PUCO orders". *Id.*

[241]Johnson's declaration does not identify Jackson.

FW: CRES Option Customers[242]
- 147–August 18, 2006 email from  Jackson to D' Ascenzo, No subject is indicated in the privilege log.[243]
- 148–January 21, 2008 email from D' Ascenzo to Colbert, MAIN4LEGAL, timeline_of_MBSSO procedure_compared_to-DERS contracts. XLS[244]

As to Documents 49, 70-72, 114, 144-45 and 148, defendants have demonstrated they are either attorney-client communications or are attorney work product. As to Documents 119 and 120, on or before **August 22, 2014,** defendants are ORDERED to provide the affidavit of Sarah Welles establishing the factual predicates to their claim of attorney-client privilege and work product protection. The affidavit should identify the Ziolkowski document(s) for which work product protection is claimed and explain why it is so protected. As to Documents 146 and 147, on or before **August 22, 2014,** defendants are ORDERED to provide the affidavit of Peggy J. Jackson establishing the factual predicates to their claim of attorney-client privilege and work product protection. Alternatively, they may submit the documents for *in camera* review.

---

[242]The privilege log says this is a "[c]onfidential e-mail communication[] regarding option agreements, prepar[ed] in connection with *Deeds* litigation and then-pending PUCO proceedings". Doc. 175-1, PageID 3605.

[243]The privilege log says this is a "[d]ocument regarding option agreements, attached to confidential A/C and WP email regarding same, prepare[ed] in connection with *Deeds* litigation and then-pending PUCO proceedings". Doc. 175-1, PageID 3606.

[244]The privilege log says this is an "E-mail forwarding draft timeline prepared by counsel in connection with the *Williams* litigation and then-pending PUCO proceedings". Doc. 175-1, PageID 3606.

**Category I: [I]ntemal counsel exchanging attorney work product for input and information. The work product contains counsels' mental impressions.**[245]

> Defendants' Claim of Privilege:  From counsel to other counsel providing material that was prepared in connection with Williams case - attorney work product.[246]

Documents:
- 34–March 6, 2007 email from D' Ascenzo to Colbert, MAIN3LEGAL_MBSSO_Timeline_of_events.DOC[247]
- 367–January 24, 2007 email from Vice President and General Counsel Jeff Gollomp to Associate General Counsel Ariane Johnson and Senior Paralegal Nancy Gay,[248] Legal memo[249]

As to these two documents, defendants have demonstrated they are either attorney-client communications or are attorney work product.

**Category J: In this category, the client seeks counsel's input and communicates with them about then-pending PUCO proceedings. Item 261 seeks input and advice from counsel (Pahutski) concerning his view of the likelihood of certain proceedings.**[250]

> Defendants' Claim of Privilege:  Client seeking advice regarding the Williams case and PUCO proceedings such as audits and other matters.[251]

---

[245]Johnson Decl., ¶ 31, PageID 3640.

[246]*Id.*, ¶ 30, PageID 3639.

[247]The privilege log says this is an "E-mail communication forwarding timelines created by counsel for *Deeds* litigation and then-pending PUCO proceedings". Doc. 175-1, PageID 3594.

[248]Johnson Decl., ¶ 10, Table, PageID 3634.

[249]The privilege log says the document is an "E-mail forwarding memorandum addressing legal issues associated with CRES contracts and settlement with industrial customers in RSP case". Doc. 175-1, PageID 3624.

[250]Johnson Decl., ¶ 31, PageID 3640.

[251]*Id.*, ¶ 30, Table, PageID 3639.

Documents:
- 44 –September 9, 2004 email from Christa Barnhart[252] to Christa Barnhart, Amy Chong,[253] and Paul Colbert, Cinergy Retail Sales agreements. Confidential e-mail communication regarding CRS agreements[254]
- 261–Bob Parsons[255] to in-house counsel Michael Pahutski and Barry F. Blackwell,[256] RE: CG&E case[257]
- 265–May 10, 2005 email from Gainer to Parsons, CG&E President Greg Ficke, Vice President for Rates Jack Steffen, Colbert, Don Walthen,[258] RE: CG&E Rate Case Expense[259]
- 270–December 2, 2005 email from Wathen to Colbert, RE: CG&E rate Case[260]

---

[252]Johnson's declaration does not identify Barnhart. She is not listed as an attorney in the table setting out the nature of the privilege claimed and the "Attorneys Involved". *Id.*, ¶ 30, PageID 3639.

[253]Johnson's declaration does not identify Chong. She is not listed as an attorney in the table setting out the nature of the privilege claimed and the "Attorneys Involved". *Id.*, ¶ 30, PageID 3639.

[254]Doc. 175-1, PageID 3595.

[255]Johnson's declaration does not identify Parsons. He is not listed as an attorney in the table setting out the nature of the privilege claimed and the "Attorneys Involved". *Id.*, ¶ 30, PageID 3639.

[256]Johnson's declaration does not identify Blackwell. He is not listed as an attorney in the table setting out the nature of the privilege claimed and the "Attorneys Involved". *Id.*, ¶ 30, PageID 3639.

[257]The privilege log says this is an "E-mail regarding communication with PUCO staff related to RSP case". Doc. 175-1, PageID 3614.

[258]Johnson's declaration does not identify Walthen. He is not listed as an attorney in the table setting out the nature of the privilege claimed and the "Attorneys Involved". *Id.*, ¶ 30, PageID 3639.

[259]The privilege log says this document is an "E-mail regarding communications with PUCO staff related to RSP case". Doc. 175-1, PageID 3615.

[260]The privilege log says this document is an "E-mail containing confidential A/C communications regarding amended stipulation in RSP case before PUCO". *Id.*

As to Doc. 44, on or before **August 22, 2014,** defendants are ORDERED to provide affidavits from Christa Barnhart and Amy Chong setting out the facts supporting their assertion of attorney-client privilege and work product protection. As to Docs. 261, 265 and 270, on or before **August 22, 2014,** defendants are ORDERED to provide affidavits from Bob Parson, Barry F. Blackwell, and Don Walthen setting out the facts supporting their assertion of attorney-client privilege and work product protection. Alternatively, they may submit the documents for *in camera* review.

**Category K: This series of communications arose initially from the Deeds' claim letter and subsequent lawsuit and resulted in communications between and among internal counsel either with Duke employees seeking information, or among themselves, seeking to gather information. This is attorney work product.**[261]

Defendants' Claim of Privilege:  Emails by which information is gathered for purposes of litigation (both *Deeds* and *Williams*) and prepared at the request of counsel.

Documents:
- 166–June 5, 2006 email from in-house lawyer Michael Pahutski to Renee Marko,[262] Constellation New Energy, Kroger Extension. Privilege log description: "E-mail forwarding draft correspondence to Kroger requesting legal review and advice".[263]
- 213–January 4, 2005 email from CG&E President Greg Ficke to D.J. Rottinghaus,[264] Colbert, Steffen, Gainer, Michael Cyrus,[265] and Todd

---

[261]Johnson Decl., ¶ 31, PageID 3640.

[262]Not identified in the Johnson Declaration.

[263]Doc. 175-1, PageID 3607.

[264]Not identified in the Johnson Declaration.

[265]Not identified in the Johnson Declaration.

Arnold,[266] RE: RSP filing. Privilege log description: "Confidential e-mail communications regarding RSP filings with PUCO".[267]

- 222– March 8, 2007 email from assistant to in-house lawyer Paul Colbert Anita M. Schafer to Steve DePenning, RE: MAIN3LEGAL_timeline_of_MBSSO_procedure_compared_to_DERS _contracts.pdf. Privilege log description: "E-mail regarding draft timeline prepared in connection with the *Deeds* litigation and then-pending PUCO proceedings".[268]

- 224–March 9, 2007 email from Steve DePenning to Schafer, MAIN-3LEGAL_timeline_of_MBSSO_procedure_compared_to_DERS_contr acts.pdf. Privilege log description: "Draft timeline prepared by counsel in connection with *Deeds* litigation and then pending PUCO proceedings".[269]

- 225–March 9, 2007 email from in-house counsel Rocco D' Ascenzo to DePenning, No subject. The file name is RE: MAIN3LEGAL_timeline_of_MBSSO_procedure_compared_to_DER contracts.pdf. Privilege log description: "Draft timeline prepared in connection with *Deeds* litigation and then pending PUCO proceedings".[270]

- 230–January 8, 2007 email from Senior Paralegal Nancy Gay[271] to in-house attorney Michael Pahutski, 2005 CRS Payments Summary.xis. Privilege log description: "E-mail forwarding option payment information requested by counsel in connection with claim by John Deeds".[272]

- 231–January 8, 2007 email from Gay to Pahutski. No subject. File name: CRS Payments Summary. xis. Privilege log description: "Spreadsheet".[273]

---

[266]Not identified in the Johnson Declaration.

[267]Doc. 175-1, PageID 3611.

[268]*Id.*

[269]*Id.*

[270]Doc. 175-1, PageID 3612.

[271]Johnson Decl., ¶ 10, Table, PageID 3634.

[272]Doc. 175-1, PageID 3612.

[273]The privilege log says that a spreadsheet file was attached to the email. *Id.*

- 242–October 21, 2004 email from Vice President for Rates Jack Steffen to CSG&E President Greg Ficke, Gainer, Steve Schrader,[274] FW: settlement vs stipulation.xis. Privilege log description: "E-mail forwarding document analyzing settlement options in RSP case".[275] (None of the senders/recipients were in defendants' legal department.)
- 387 -November 13, 20-06 email from Jim Ziolkowski to Schafer, Re: Agreements. Privilege log description: "E-mail chain concerning confidential A/C communications from Colbert related to option agreements".[276]
- 390–October 8, 2008 email from Jim Ziolkowski to Barry W. Wood,[277] RE: DERS Option Payments To Hospitals 2007 and 2008. Privilege log description: "E-mail containing confidential A/C communication regarding option payments and gathered in connection with *Williams* litigation".[278]

As to document 166, on or before **August 22, 2014,** defendants are ORDERED to provide an affidavit from Renee Marko stating the factual predicates for their assertions of the attorney-client privilege and work product protection. As to Document 213, on or before **August 22, 2014,** defendants are ORDERED to provide a affidavits from Greg Ficke, D.J. Rottinghaus, Michael Cyrus, and Todd Arnold stating the factual predicates for their assertions of the attorney-client privilege and work product protection. As to Documents 350-54, 364-66, 368 and 376, on or before **August 22, 2014,** defendants are ORDERED to provide an affidavit from Paul Colbert stating the factual predicates for their assertions of the attorney-client privilege and work product protection. As to Documents 222 and 224,

---

[274]Not identified in the Johnson Declaration.

[275]Doc. 175-1, PageID 3613.

[276]*Id.*, PageID 3626.

[277]Not identified in the Johnson Declaration.

[278]Doc. 175-1, PageID 3627.

on or before **August 22, 2014,** defendants are ORDERED to provide an affidavit from Steve DePenning stating the factual predicates for their assertions of the attorney-client privilege and work product protection. As to document 242, on or before **August 22, 2014,** defendants are ORDERED to provide n affidavits from Jack Steffen, Greg Ficke, Jim Gainer, and Steve Schrader stating the factual predicates for their assertions of the attorney-client privilege and work product protection. As to Documents 222 and 224, on or before **August 22, 2014,** defendants are ORDERED to provide an affidavit from Steve DePenning stating the factual predicates for their assertions of the attorney-client privilege and work product protection. As to Documents 387 and 390, on or before **August 22, 2014,** defendants are ORDERED to provide affidavits from Jim Ziolkowski and Barry W. Wood stating the factual predicates for their assertions of the attorney-client privilege and/or work product protection. Alternatively as to the above documents, defendants may submit them for *in camera* inspection.

Defendants have demonstrated that Documents 230 and 231 are attorney-client and/or work product protected documents.

**Category L: [D]ocuments created by counsel, including notes and mental impressions, in connection with the defense of the *Williams* and *Deeds* matters.**[279]

Defendants' Claim of Privilege:  Attorney notes and mental impressions for *Williams*/*Deeds* and PUCO matter.[280]

Documents:
- 347–August 28, 2007 email from Associate General Counsel George

---

[279]Johnson Decl., ¶ 31, PageID 3640.

[280]*Id.*, ¶ 30, Table, PageID 3639.

Dwight[281] to outside counsel Michael Dortch, DERS President Chuck Whitlock,[282] in-house counsel Michael Pahutski, and Fred Wiesen[283], RE: Revised draft response to Chesley[284]

- 348 –Paul Colbert author of otherwise unidentified 2007 document. No indication of who, if anyone, received the document. The privilege log describes the document as "Attorney notes regarding option contracts, prepared in connection with *John Deeds v. Duke Energy* ("*Deeds*") litigation and PUCO proceedings".[285]
- 349–November 14, 2006 document created by Ariane Johnson, The privilege log describes the document as "Witness interview notes prepared by counsel in connection with *Deeds* claim and then-pending PUCO proceedings".[286]

Defendants have demonstrated that Documents 230 and 231 are attorney work product.


**Category M: This document is legal advice from internal counsel concerning RSP notice requirements under regulatory law.[287]**

Defendants' Claim of Privilege: Attorney advice to client on RSP notice requirements.[288]

Documents:

---

[281]*Id.*, ¶ 10, Table, PageID 3635

[282]*Id.*, ¶¶ 21 and 24, PageID 3636-37

[283]Not identified in the Johnson Declaration and not included in ¶ 30, Table "Attorneys Involved" column. *Id.*, PageID 3638.

[284]The privilege log says this is an "E-mail containing confidential A/C communications regarding public records request submitted by Stanley Chesley to the PUCO". Doc. 175-1, PageID 3622.

[285]*Id.*

[286]*Id.*

[287]Johnson Decl., ¶ 31, PageID 3640.

[288]*Id.*, ¶ 30, Table, PageID 3639.

- 184–November 28, 2004 email from in-house lawyer Paul Colbert to Marcia J. Myers,[289] CSG&E President Greg Ficke, Vice President for Regulatory and Legislative Strategy Jim Gainer, Vice President for Rates Jack Steffen and Don Jones,[290] RE: Legal Notice to All Non-Residential Customers of the Cincinnati Gas &Electric Company[291]

Defendants have demonstrated that Document 184 is an attorney-client communication.

For the reasons set out above, plaintiff's January 10, 2014 motion to compel Duke to produce documents for which it claims attorney-client privilege or work product protection or, in the alternative, for *in camera*, review of those documents (doc. 175) is GRANTED, in part, and DENIED, in part.  Defendants' February 18, 2014 motion to strike affidavits attached to plaintiffs' reply brief (doc. 180) is DENIED. I considered the affidavits when deciding whether plaintiffs had made a sufficient showing that the crime-fraud exception to the attorney-client privilege required an *in camera* review of the withheld documents.

**Non-dispositive notice right appeal**

Under the provisions of 28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P., and Eastern Division Order No. 91-3, pt. F, 5, either party may, within fourteen (14) days after this Order is filed, file and serve on the opposing party a motion for reconsideration by the District Judge.  The motion must specifically designate the Order, or part thereof, in

---

[289]Not identified in the Johnson Declaration.

[290]Not identified in the Johnson Declaration.

[291]Doc. 175-1, PageID 3608.

question and the basis for any objection thereto.  The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

s/Mark R. Abel
United States Magistrate Judge